PFEIFFER *v.* BOARD OF EDUCATION OF DETROIT.

1. CONSTITUTIONAL INTERPRETATION—RULES OF.

    A constitutional provision could not mean one thing at the time of its adoption, and another thing at a subsequent time; and hence it is to be construed with reference to the state of the law at the time of such adoption, and to the practices and usages then prevailing.

2. SCHOOLS—READINGS FROM BIBLE—JUDICIAL NOTICE.

    Judicial notice may be taken of the practice, which has obtained for many years in the public schools, of reading from the Bible and offering prayer in the presence of the pupils.

3. SAME—CONSTITUTIONAL LAW—CIVIL RIGHTS.

    The use in the public schools, for 15 minutes at the close of each day's session, as a supplemental text-book on reading, of a book entitled "Readings from the Bible," which is largely made up of extracts from the Bible emphasizing the moral precepts of the Ten Commandments, where the teacher is forbidden to make any comment upon the matter therein contained, and is required to excuse from that part of the session any pupil upon application of his parent or guardian, is not a violation of the State Constitution, article 4, § 41, prohibiting the legislature from diminishing or enlarging "the civil or political rights, privileges, and capacities of any person on account of his opinion or belief concerning matters of religion."

4. SAME—APPROPRIATIONS FOR RELIGIOUS SECT OR SEMINARY.

    Nor is it a violation of article 4, § 40, providing that "no money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary, nor shall property belonging to the State be appropriated for any such purposes." [1]

5. SAME—PLACES OF WORSHIP—COMPULSORY ATTENDANCE—TEACHERS OF RELIGION—TAXATION.

    Nor is it a violation of article 4, § 39, providing that "the legislature shall pass no law to prevent any person from wor-

---

[1] The matter of public aid to sectarian institutions is considered in a note to *Synod of Dakota* v. *State*, (S. Dak.) 14 L. R. A. 418.

shiping Almighty God according to the dictates of his own conscience, or to compel any person to attend, erect, or support any place of religious worship, or to pay tithes, taxes, or other rates for the support of any minister of the gospel or teacher of religion."

MOORE, J., dissenting.

*Certiorari* to Wayne; Carpenter, J.    Submitted January 26, 1898.    Decided December 6, 1898.

*Mandamus* by Conrad Pfeiffer to compel the board of education of the city of Detroit to discontinue the use in the public schools of a book known as "Readings from the Bible." From an order granting the writ, respondent brings *certiorari.*    Reversed.

*John C. Tobias* (*H. H. Hatch* and *Fred A. Baker,* of counsel), for relator.

*Jasper C. Gates* (*William E. Baubie,* of counsel), for respondent.

MONTGOMERY, J.    The relator applied to the circuit court of Wayne county to compel the respondent to discontinue the use of a certain book, known as "Readings from the Bible," in the public schools of Detroit.    The answer of respondent contains the following statement, which we quote:

"It is not true that said book is devoted almost entirely or principally to the subject of religion, to the subject of relations of man to Almighty God, or to the subject of worshiping God, or to all these subjects, but this respondent says that said book is, for the greater part, made up of moral precepts affirming and emphasizing the moral obligations laid down in the Ten Commandments; that, while some of the passages in said book do relate to the power, goodness, and mercy of Almighty God, the said book is made up almost entirely of extracts from the Bible emphasizing the moral precepts of the Ten Commandments, and which are intended merely to inculcate good morals,—that is, our duty to each other,—which ought to be understood and practiced by every good citizen, and concerning the

118 MICH.—36.

fundamental principles of which the religious sects do not disagree. * * * No teacher in said schools is required by law to give instructions from the last said book, except such as is absolutely necessary for the use of the same as a supplemental text-book on reading, and no teacher is by said board allowed to make note or comment upon anything in said book contained; and, further, said book is used as a supplemental text-book on reading, as aforesaid, and not otherwise. * * * It has never been the purpose nor intention of said board to require of the pupils of the grammar grades in said schools to listen to the readings from said book, but, on the contrary, such readings take place at the close of the sessions of said schools, and any and all pupils, by the order of said board, are excused therefrom upon the applications of either their parents or guardians; and, further, said superintendent is not vested with, nor is he authorized to exercise, any discretion whatever in the matter, but is required, under and by the rules of said board, to excuse any and all pupils from being present at such readings whenever an application therefor is made by the parents or guardians of such pupil or pupils."

The contention of relator is that the action of the board is forbidden by the Constitution of the State. The provisions touching this question are as follows (article 4):

"SEC. 39. The legislature shall pass no law to prevent any person from worshiping Almighty God according to the dictates of his own conscience, or to compel any person to attend, erect, or support any place of religious worship, or to pay tithes, taxes, or other rates for the support of any minister of the gospel or teacher of religion.

"SEC. 40. No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary, nor shall property belonging to the State be appropriated for any such purposes.

"SEC. 41. The legislature shall not diminish or enlarge the civil or political rights, privileges, and capacities of any person on account of his opinion or belief concerning matters of religion."

The precise question is not whether the pupil can be compelled to attend religious exercises, nor necessarily whether the reading of the Bible, or an extract from it, constitutes religious worship; but whether such reading of

extracts from the Bible, at which reading pupils whose faith or scruples are shocked by hearing the passages read are not required to attend, constitutes the teacher a teacher of religion, or amounts to a restriction of the civil or political rights or privileges of such students as do not attend upon the exercises.

Is the reading of extracts taken from the Bible a violation of the provision of the Constitution which inhibits the diminishing or enlargement of the civil or political rights, privileges, and capacities of the individual on account of his opinion or belief concerning matters of religion? We do not think it can be maintained that this section has any application to this subject.. The primary purpose of this provision was to exclude religious tests, and to place all citizens on an equality before the law as to the exercise of the franchise of voting or holding office. The language is inapt to be applied as restricting the use of school-rooms or school funds. It might be said that many of the students in our schools are not in position to avail themselves of the opportunity to study the dead languages. Is it therefore an unjust discrimination to provide for instruction in Latin and Greek for such pupils as are able to devote their time to those studies? Does it harm one who does not, for conscientious reasons, care to listen to readings from the Bible, that others are given the opportunity to do so? Is it not intolerant for one not required to attend to object to such readings? It may be said, of course, that the services of the teacher while engaged in these exercises are paid out of the fund in which all are entitled to share; but the same is true of the time which the teacher devotes to the languages, or instruction in higher mathematics. Does it follow that the civil rights or privileges of the students who do not accept teaching in those branches, or those who do, have been, on the one hand, diminished, or, on the other, enlarged? I do not think it should be so held.

Nor has section 40 any more appropriate application. This section has a very plain meaning, which is that the

public money may not be turned over to a religious sect to maintain churches or seminaries; and unless the readings from the Bible, or selections from the Bible, constitute the public school a religious or theological seminary, this section has not, in my judgment, any application.

As is stated in the opinion of the learned circuit judge, the most significant provision is section 39; and the meritorious question is whether any student or any taxpayer has been compelled to attend, erect, or support a place of religious worship, or to pay tithes, taxes, or other rates for the support of any minister of the gospel or teacher of religion. In determining this question, we should endeavor to place ourselves in the position of the framers of the Constitution, and ascertain what was meant at the time; for, if we are successful in doing this, we have solved the question of its meaning for all time. It could not mean one thing at the time of its adoption, and another thing today, when public sentiments have undergone a change. *McPherson* v. *Secretary of State*, 92 Mich. 377 (16 L. R. A. 475, 31 Am. St. Rep. 587). It is therefore essential that we determine the intent of this provision by reference to the state of the law or custom previously existing, and by the contemporaneous construction, rather than attempt to test its meaning by the so-called advanced or liberal views obtaining among a large class of the community at the present day.

A similar provision was introduced into the convention of 1835. The provision was as follows:

"Every person has a right to worship Almighty God according to the dictates of his own conscience; and no person can of right be compelled to attend, erect, or support, against his will, any place of religious worship, or pay any tithes, taxes, or other rates for the support of any minister of the gospel or teacher of religion." Const. 1835, art. 1, § 4.

As is pointed out in the brief of the learned counsel for the respondent (to whom we are much indebted for a most laborious and careful research into the historical

origin of this provision), the provision was doubtless taken from the Virginia constitution of 1830. It is clearly shown by that research that the inhabitants of that commonwealth were by statute compelled to attend upon divine service. Ministers were, in public statutes, referred to as "teachers of religion." In 1784 a statute making provision for the support of ministers of the established church was introduced under the title of "A bill to establish a provision for *teachers of the Christian religion*." This statute was repealed by a general statute adopted in 1786, entitled "An act for establishing religious freedom," the preamble of which clearly shows that the term "teacher of religion" was used as synonymous with "minister." The constitution of 1830 was but an embodiment of this enactment in the organic law of the State. Can it be said that the adoption of this provision into our constitution of 1835 was intended to have a wider scope? I think not. It is significant that this constitution was adopted in pursuance of authority conferred by article 5 of the articles of compact contained in the ordinance of 1787 (*Scott v. Detroit Young Men's Society*, 1 Doug. 119), which gave to the people of the territory a right to form a constitution in conformity with the principles contained in the articles. The ordinance of 1787 declared that religion, morality, and knowledge were necessary to good government and the happiness of mankind, and provided that, for these purposes, schools and the means of education should forever be encouraged. It is not to be inferred that, in forming a constitution under the authority of this ordinance, the convention intended to prohibit in the public schools all mention of a subject which the ordinance, in effect, declared that schools were to be established to foster,—particularly as the provision, when traced to its historic origin, is shown to have been aimed at quite another evil. In my opinion, this provision, when incorporated into our organic law, meant simply that the inhabitants of the State should not be required to attend upon those church services which the

people of Virginia had been by this same enactment relieved from, and that no one should be compelled to pay tithes or other rates for the support of ministers. If this meaning attached at that time, it has not been changed since.

I do not wish to be understood as assenting to the proposition that the ordinance of 1787 makes it imperative that religion shall be taught in the public schools. It was doubtless the opinion of the framers of that great document that public schools would of necessity tend to foster religion. But the extent to which I go is to say that the language of this instrument, when read in the light of the fact that this was at that date a Christian nation, is such as to preclude the idea that the framers of the constitution, "in conformity with the principles contained in the ordinance," intended, in the absence of a clear expression to that effect, to exclude wholly from the schools all reference to the Bible. I should certainly mistrust my judgment if it led me to a different conclusion, and on the best of grounds. The return in this case shows that since the admission of this State into the Union, a period of more than half a century, the practice has obtained in all the State institutions of learning of not only reading from the Bible in the presence of students, but of offering prayer; that the text-books used in the public schools of the State have contained extracts from the Bible, and numerous references to Almighty God and His attributes; and all this without objection from any source. These usages we may also take judicial notice of. In a doubtful case, involving any other question than one which appeals so strongly to the prejudices of men, would not this universal usage, extending over so long a period, be deemed decisive by every one as a practical construction made by the administrative branch of government? Judge COOLEY, in his Constitutional Limitations (page 82, 6th Ed.), says:

"Where a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the constitution,

and by those who had opportunity to understand the intention of the instrument, it is not to be denied that a strong presumption exists that the construction rightly interprets the intention."

See, also, *McPherson* v. *Secretary of State*, 92 Mich. 383 (16 L. R. A. 475, 31 Am. St. Rep. 587), and cases cited.

In treating of the effect of the provision in the several state constitutions corresponding to that under discussion, Judge COOLEY, in the work above cited, says, at page 578:

"The American constitutions contain no provisions which prohibit the authorities from such solemn recognition of a superintending Providence in public transactions and exercises as the general religious sentiment of mankind inspires, and as seems meet and proper in finite and dependent beings. Whatever may be the shades of religious belief, all must acknowledge the fitness of recognizing in important human affairs the superintending care and control of the great Governor of the Universe, and of acknowledging with thanksgiving His boundless favors, or bowing in contrition when visited with the penalties of His broken laws. No principle of constitutional law is violated when thanksgiving or fast days are appointed; when chaplains are designated for the army and navy; when legislative sessions are opened with prayer or the reading of the Scriptures; or when religious teaching is encouraged by a general exemption of the houses of religious worship from taxation for the support of state government."

The weight of the authority of the adjudicated cases sustains the contention of the learned counsel for the respondent. The subject came before the supreme court of Maine as early as 1854. The question arose as to whether the constitution prohibited the reading of the Bible in the public schools, in *Donahoe* v. *Richards*, 38 Me. 379 (61 Am. Dec. 256). The provisions of the Maine constitution are substantially different from ours, and the decision is not, therefore, necessarily decisive. For its force as an argument, however, we quote the following language from pages 398, 399:

"The common schools are not for the purpose of instruction in the theological doctrines of any religion or of any sect. The State regards no one sect as superior to any other, and no theological views as peculiarly entitled to precedence. It is no part of the duty of the instructor to give theological instruction, and, if the peculiar tenet of any particular sect were so taught, it would furnish a well-grounded cause of complaint on the part of those who entertained different or opposing religious sentiments. But the instruction here given is not in fact, and is not alleged to have been, in articles of faith. No theological doctrines were taught. The creed of no sect was affirmed or denied. The truth or falsehood of the book in which the scholars were required to read was not asserted. No interference, by way of instruction, with the views of the scholars, whether derived from parental or sacerdotal authority, is shown. The Bible was used merely as a book in which instruction in reading was given. But reading the Bible is no more an interference with religious belief than would reading the mythology of Greece or Rome be regarded as interfering with religious belief or an affirmance of the pagan creeds. A chapter in the Koran might be read, yet it would not be an affirmation of the truth of Mohammedanism, or an interference with religious faith. The Bible was used merely as a reading book, and for the information contained in it, as the Koran might be, and not for religious instruction. If suitable for that, it was suitable for the purpose for which it was selected. No one was required to believe, or punished for disbelief, either in its inspiration or want of inspiration, in the fidelity of the translation or its inaccuracy, or in any set of doctrines deducible or not deducible therefrom."

Article 1, § 3, of the constitution of Iowa, is as follows:

"The general assembly shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; nor shall any person be compelled to attend any place of worship, pay tithes, taxes, or other rates for building or repairing places of worship, or the maintenance of any minister or ministry."

I have endeavored to show that "religious teacher," when used in our constitution, is synonymous with "minister." If I have been successful in this, the pro-

vision of the Iowa constitution is, in substance, identical with section 39 of article 4 of our constitution. In *Moore* v. *Monroe*, 64 Iowa, 367 (52 Am. Rep. 444), the supreme court of Iowa had occasion to consider this provision, and it was held not violated by the reading of the Bible in the public schools. See, also, *Nessle* v. *Hum*, 1 Ohio, N. P. 140; *Spiller* v. *Inhabitants of Woburn*, 12 Allen, 127. *Contra, State, ex rel. Weiss*, v. *District School Board*, 76 Wis. 177 (20 Am. St. Rep. 41).

In my opinion, the reading of the extracts from the Bible in the manner indicated by the return, without comment, is not in violation of any constitutional provision. I am not able to see why extracts from the Bible should be proscribed, when the youth are taught no better authenticated truths of profane history.

The order of the circuit court should be reversed.

GRANT, C. J., HOOKER and LONG, JJ., concurred with MONTGOMERY, J.

MOORE, J. (*dissenting*). The questions, both of fact and of law, involved in this case, are so ably stated by Judge Carpenter in his written opinion, that I quote it here:

"Conrad Pfeiffer, a resident of the city of Detroit, a taxpayer therein, and the father of Louis Pfeiffer, a thirteen-year-old boy, who is by law compelled to and does attend the public schools of Detroit, applies in this case for a *mandamus* commanding the respondent, the board of education of the city of Detroit, to discontinue the use of a book entitled 'Readings from the Bible' in said public schools. Respondent, notwithstanding the veto of Honorable George Beck, acting mayor of the city of Detroit, purchased 4,000 copies of this book late in 1896, and introduced them into all the grammar grades of the public schools of the city, under a resolution of which the following is a copy:

"'*Resolved*, that "Readings from the Bible" be read during each daily school session at such times as the superintendent shall direct; and, further, upon the application in writing from the parents or guardian of any pupil, the superintendent be instructed to excuse such pupil from attendance during such readings.'

"The intent and purpose of respondent was 'to have said books read by teachers in said schools in the presence and hearing of their pupils attending said schools, all to the end that said pupils might become familiar with the contents of said book.' It was conceded on the argument (though I do not find the fact stated in the record) that the superintendent has designated the last 15 minutes of each day for the use of this book. Respondent's answer states that no teacher is required by law to give instructions from such book, 'except such as is absolutely necessary for the use of the same as a supplemental text-book on reading,' and no teacher is allowed by said board to make any note or comment upon anything in said book contained. The single question in this case is whether the action of the respondent in thus introducing this book in the public schools is forbidden by the Constitution of the State of Michigan. The constitutional provisions touching this question are as follows (article 4):

"'SEC. 39. The legislature shall pass no law to prevent any person from worshiping Almighty God according to the dictates of his own conscience, or to compel any person to attend, erect, or support any place of religious worship, or to pay tithes, taxes, or other rates for the support of any minister of the gospel or teacher of religion.

"'SEC. 40. No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary, nor shall property belonging to the State be appropriated for any such purposes.

"'SEC. 41. The legislature shall not diminish or enlarge the civil or political rights, privileges, and capacities of any person on account of his opinion or belief concerning matters of religion.'

"The most significant provisions of these sections, so far as the question under consideration is concerned, are the prohibition against passing a law to compel any person to pay tithes, taxes, or other rates for the support of a teacher of religion, and the prohibition against the legislature's diminishing or enlarging the civil or political rights, privileges, and capacities of any person on account of his opinion or belief concerning matters of religion. In the view I take of this case, as will hereafter appear, there is no necessity for considering any other of the provisions above quoted.

"Ordinarily, constitutional provisions respecting fundamental rights have a prior history which throws much light upon their construction. I am unable to find,

notwithstanding the aid of diligent and learned counsel, that these provisions appeared in constitutional or statutory law until they appeared in the constitution of Michigan framed and adopted in the year 1835. In that constitution the sections containing these provisions appeared, not under the title 'Legislative Department,' but under the title 'Bill of Rights,' and they read as follows:

" 'SEC. 4. Every person has a right to worship Almighty God according to the dictates of his own conscience; and no person can of right be compelled to attend, erect, or support, against his will, any place of religious worship, or pay any tithes, taxes, or other rates for the support of any minister of the gospel or teacher of religion.'

" 'SEC. 6. The civil and religious rights, privileges, and capacities of no individual shall be diminished or enlarged on account of his opinions or belief concerning matters of religion.'

"The language of these significant prohibitions, so far as I can learn, has never received a judicial construction. It is, however, well settled that in construing constitutional provisions they are to be given their natural and ordinary meaning. Cooley, Const. Lim. (6th Ed.) 73. It would seem to follow that the only question to be determined in this case is whether these provisions, according to their natural and ordinary meaning, prohibit respondent taking the action sought to be restrained. Respondent's counsel, however, insist that these provisions are not to be given their natural and ordinary meaning. They insist that the language in the ordinance creating the Northwest Territory, 'religion, morality, and knowledge being essential to good government and the happiness of mankind, schools and the means of education shall forever be encouraged,' enjoins the teaching of religion in the public schools; that this ordinance was a part of the constitution of 1835, and must control the meaning of the language in that constitution just quoted. They contend that the provisions of the constitution must be controlled by the provisions of the ordinance, because the constitution of 1835 was adopted, and Michigan became a state, under the right given in that ordinance to form a permanent constitution and state government when it should have 60,000 inhabitants, 'provided the constitution and government so to be formed shall be republican, and in conformity with the principles contained in these articles,' and because the preamble to the constitution

asserted a compliance with the conditions of the ordinance.

" Respondent's counsel do not shrink from the logic of their position. They contend that it is the duty of every school board to teach the Christian religion. If their position is sound, not only should the Bible be taught, but all other forms of Christian religious instruction should be given in the schools. If this reasoning is sound, the constitution left it open to the school authorities to determine what variety of Christian religion they should teach, and the school board of the city of Detroit has the power today to have taught in the public schools of the city of Detroit the theological tenets of any Christian church. It is not contended that the people, in adopting a constitution, could not have freed themselves from the provisions of the ordinance referred to, for it is settled by many decisions that they could; but it is contended that they did not. It is not contended that the constitution shall not receive the construction that those adopting it intended, but that such a construction compels the public schools in any way encouraged by the government to teach the Christian religion. If this encouragement takes the form of support by taxation, the constitution, then, according to this construction, compels the payment of taxes for the support of one who teaches the Christian religion. It is therefore seriously contended that the people, when they adopted a constitution saying that no person can of right be compelled to pay taxes for the support of any teacher of religion, intended to compel persons to pay taxes for the support of teachers of religion, because they asserted in the preamble to the constitution that they had complied with the conditions of the ordinance, which imposes such support. It is impossible that the people meant the precise opposite of what they explicitly declared. If the ordinance imposes taxation for the support of teachers of religion, the people, when they asserted that they had complied with its provisions by making a constitution which forbade such support, could not have thought that to be a condition with which they were bound to comply. They expressed themselves clearly in their constitution as to the continuance in force of existing laws by saying (schedule, § 2): 'All laws now in force in the Territory of Michigan, which are not repugnant to this constitution, shall remain in force until they expire by their own limitations, or be altered or repealed by the legislature.' Under this provision, parts of

the ordinance of 1787 were of legal force in Michigan after the adoption of its constitution; but no part of such ordinance repugnant to the constitution had any legal force, nor has any court so held.

"Nor, in my judgment, are counsel correct in their contention that the language, 'religion, morality, and knowledge being essential to good government and the happiness of mankind, schools and the means of education shall forever be encouraged,' requires religion to be taught in the public schools. This language is clear. It enjoins forever the encouragement of schools and all means of education, because religion, morality, and knowledge, being essential to good government and the happiness of mankind, will be promoted thereby. It is an expression of the faith that I was taught as a child, and that I, in common with many others, still hold, that, as you increase the efficiency of schools and other means of education, religion, morality, and knowledge will prosper. The language in the provision of the ordinance relied upon enjoins the encouragement of schools and the means of education. Schools and the means of education are to be encouraged, not in any prescribed method, but by all feasible methods. That method might take the form of maintaining public schools by taxation. It might take the form of exempting private schools from taxation. *Detroit Home & Day School* v. *City of Detroit*, 76 Mich. 521 (6 L. R. A. 97). If religion must be taught in all schools encouraged, it must be taught in all schools exempt from taxation, and Judge CAMPBELL was wrong, in the case above cited, in expressing the thought that, according to the language under discussion, the property of a school not teaching religion should be exempt from taxation.

"The supreme court of Ohio, in construing a clause of the constitution of that State containing language similar to that under discussion, said:

" 'The meaning is that *true* religion, *true* morality, and *true* knowledge shall be promoted by encouraging schools and means of instruction. The last named of these three words, "knowledge," comprehends in itself all that is comprehended in the other two words, "religion" and "morality," and which can be the subject of human instruction. True religion includes true morality. All that is comprehended in the word "religion," or in the words "religion and morality," and that can be the subject of human "instructions," must be included under the general term "knowledge." Nothing is enjoined, therefore, but the encouragement of means of instruc-

tion in general "knowledge,"—the knowledge of *truth*. The fair interpretation seems to be that true "religion" and "morality" are aided and promoted by the increase and diffusion of "knowledge," on the theory that knowledge is the handmaid of virtue, and that all three—religion, morality, and knowledge—are essential to good government.' *Board of Education of Cincinnati* v. *Minor*, 23 Ohio St. 211, 243 (13 Am. Rep. 233).

"It was decided in that case, as it would follow from the reasoning advanced in this opinion, that, notwithstanding the language of the provision under discussion, the authorities in charge of the schools can exclude religion therefrom. If that provision permits the school board by resolution to exclude religious instruction, it certainly permits the people by constitutional enactment to exclude it. I am clearly of the opinion, therefore, that the constitution of 1835 did not require the Christian religion to be taught in the public schools because of anything contained in the ordinance of 1787; and this disposes of the only claim made in this case that the provisions in question are modified in any way by other parts of the constitution.

"While it is conceded that no authority in charge of any school in Michigan ever took any formal official action introducing the Bible, or any part of it, as a text-book in such school, it is averred in respondent's answer that, from the time the Territory of Michigan came under the dominion of the United States, it has been the constant practice and custom to read the Bible and offer prayer in the public schools of Detroit and of the State, and in the State institutions of learning, in the presence of the pupils, and that this practice has not been objected to by any one. It is insisted that these facts afford evidence of the proper construction of the constitutional provisions involved in this case. If these facts are to have any weight in determining the construction of those provisions, that weight can in no manner depend upon the averments of the answer. A legal construction must be given to the constitution. That construction cannot depend upon facts which must be averred or proved; otherwise a constitutional provision would receive a construction in each case according to the facts proved therein, and should be submitted to the determination of a jury. It is true that in doubtful cases extrinsic facts are considered in determining construction, but these are always facts of which the court takes judicial notice,—such facts of common

knowledge, facts established by historical or public documents. It follows, therefore, that the court is not aided by the averments in the answer. Possibly the answer, taken in connection with the concession that no school authority ever ordered the Bible to be read in the schools as a text-book, means simply this: That it has been the practice in some schools of this State for teachers who are members of some of the various religious denominations whose doctrines are based upon the Bible to open their schools with selections from the Bible, and with other devotional exercises. Of the existence of such a custom it is not unlikely the courts will take judicial notice. *State, ex rel. Weiss,* v. *District School Board,* 76 Wis. 177 (20 Am. St. Rep. 41).

"The rule determining the admissibility of such customs to affect the construction of constitutional provisions is stated by Judge COOLEY in language which has never been questioned since he framed it, as follows:

" ' We think we allow to contemporary and practical construction its full legitimate force when we suffer it, where it is clear and uniform, to solve in its own favor the doubts which arise on reading the instrument to be construed.' Cooley, Const. Lim. (6th Ed.) 86.

"Language could not be clearer than that of the constitutional provisions under discussion. What doubt as to their meaning can possibly arise to one who carefully reads them? ' The legislature shall pass no law  *  *  * to compel any person  *  *  * to pay tithes, taxes, or other rates for the support of any minister of the gospel or teacher of religion.' 'The legislature shall not diminish or enlarge the civil or political rights, privileges, and capacities of any person on account of his opinion or belief concerning matters of religion.' No one has suggested, and I believe no one can point out, any uncertainty in the meaning of this language. It is only by looking outside these provisions, and outside the constitution containing them, that any doubt of their meaning arises. The following language of Judge COOLEY is so directly applicable that it reads as if it were written especially for this case:

" ' Possible or even probable meanings, when one is plainly declared in the instrument itself, the courts are not at liberty to search for elsewhere. "Whether we are considering an agreement between parties, a statute, or a constitution, with a view to its interpretation, the thing which we are to seek is the thought which it expresses. To ascertain this, the first resort in all cases is to the

natural significance of the words employed, in the order of grammatical arrangement in which the framers of the instrument leave placed them. If, thus regarded, the words embody a definite meaning, which involves no absurdity and no contradiction between different parts of the same writing, then that meaning, apparent on the face of the instrument, is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare is the meaning of the instrument, and neither courts nor legislatures have a right to add to or take away from that meaning." Cooley, Const. Lim. (6th Ed.) 70, 71.

"After this lengthy discussion, I conclude that the evidence of practical construction is inadmissible, and that the only question in the case is whether these constitutional provisions, according to their natural and ordinary meaning, prohibit respondent's proposed action. Respondent's counsel contend that the prohibition in our present constitution is not a restraint upon the action of respondent, but is only a restraint upon the legislature. The respondent board derives all its powers from the law passed by the legislature. If it has any power to compel the teaching of religion in the public schools, it must have it because it was given it, either expressly or by implication, by a law passed by the legislature. It will not be contended that the legislature could by implication give the board more power than it could give it by express enactment. It follows, therefore, that if the legislature could not by law compel a person to pay taxes for the support of a teacher of religion, or could not by law enlarge or diminish the civil or political rights, privileges, and capacities of a person on account of his religious belief, the respondent cannot. This doctrine is elementary. Cooley, Const. Lim. (6th Ed.) 238, 239.

"Does respondent's action compel the payment of taxes for the support of a teacher of religion? Does it enlarge or diminish the civil rights, privileges, and capacities of any person on account of his opinion or belief concerning matters of religion? As the teachers who use the book are supported in part by taxes, and as no one will deny that the equal right to the benefits and advantages of the public school is a civil right, the answers to the foregoing questions depend on the answer to the following question: Does a teacher who reads the book, 'Readings from the Bible,' to his pupils 15 minutes every day, thereby teach religion? The argument of the senior counsel for the

respondent in this case assumes that he does, but the answer of respondent denies it.    This question must therefore be determined from an examination of the book, and its proposed use by the teacher.    The book contains 150 selections taken from the King James version of the Bible, and most of them from the Old Testament.    Aside from a few pages of a prefatory character, the book contains nothing except those selections and their headings.    The Bible is a religious book, and is the foundation of the religion of a large part of the civilized world.    It ought to be unnecessary to prove that 'Readings from the Bible' contains religious instruction.    To charge that it does not is to charge that the book is not properly named.    From the introductory sketch of the book, it is clearly to be inferred that it was compiled in order that there might be taught in the schools the fundamentals of religion accepted alike by Protestants, Catholics, and Jews.    If that purpose were carried out, the book would contain instruction in the fundamentals of religion accepted by Protestants, Catholics, and Jews.    If, on the other hand, as vigorously claimed, many selections tend to discredit one of these religions, the book none the less contains religious instruction. Nearly every selection in the book either treats of Almighty God, of some of His attributes, or of man's relation to Him.    It is difficult, perhaps impossible, to exactly define 'religion.'    But every one will concede that a book treating of Almighty God, His attributes, and man's relation to Him, is a religious book.    Is it to be used for the purpose of teaching religion?    I think, in determining this question, we should look, not so much at the purpose that the officials who adopted it had in view, as we should at the purpose which the book is calculated to accomplish; but, whether we look at the one or the other, we reach the same conclusion.    This book was brought to the attention of respondent board by a report of its committee on textbooks and course of study.    They recommended its use in the schools, and in that report stated:

"'Your committee * * * desires to invite the consideration of the board to the matter of securing in our schools an increased attention to the principles of ethics or morals, which are so vitally essential in the formation of a true and well-developed, manly character, which are indispensable for the welfare of the individual, the home, and the nation,—an attention which should inculcate those principles of morality, and even religion, in which the great masses of our people believe, and which should prevail.'

118 MICH.—37.

"What purpose is the book calculated to accomplish? While the design of the compilers of the book was to have the book read 'in unison,' it appears from the admitted facts in this case to be respondent's intention and purpose 'to have said book read by the teachers in said-schools in the presence and hearing of their pupils attending said schools, all to the end that said pupils might become familiar with the contents of said book;' and it is to be read, also, without note or comment. Can there be any doubt that the result of such action will tend to the acceptance by those pupils of the statements in the selections as true? If a book on political economy or any science were to be read by a teacher to the pupils without note or comment, would not the pupils accept the teachings of that book as true? Does not the fact that the teacher reads the book without note or comment warrant the pupil in believing that what is read is recommended to him as true? There can be but one answer to these questions. It may be suggested that the contents of the book are not taught to the pupils, because it is simply read to them, without note or comment. As just stated, it is conceded that the book is read to the end that said pupils may become familiar with its contents. The object, then, of reading the book, is to teach the children its contents. Reading it without note or comment is an unusual form of teaching. It may be an imperfect and incomplete form of teaching, but it is teaching, nevertheless, and equally within the constitutional prohibition. *State, ex rel. Weiss,* v. *District School Board,* 76 Wis. 177 (20 Am. St. Rep. 41).

"It is no answer to the charge that the contemplated use of 'Readings from the Bible' is teaching religion, to say that the book also teaches morality. What religious book could not be taught in the schools, if the morality of its doctrines were to determine its use? Teaching religion at the expense of the taxpayers is forbidden by the constitution, and teaching morality is not commanded by it. Nor is it possible to take a middle ground, and insist that the religion of the Bible can be taught in the schools, and other religious teachings excluded. It is impossible to frame an argument which, under our constitution, will permit respondent to carry out its proposed action, which will not permit it to teach any religion it may choose to teach. The constitution prohibits all religious teaching in the public schools, or it prohibits none. The provision

against compelling a person to pay taxes for the support of a teacher of religion either forbids the proposed use of 'Readings from the Bible,' or it forbids nothing. It seems to me clear that such teacher is a teacher of religion, towards whose support persons are compelled to pay taxes; and therefore the constitution, in explicit language, forbids such proposed use.

"It seems to me equally clear that the action of respondent is in violation of the provision of the constitution that the legislature shall not diminish or enlarge the civil or political rights, privileges, and capacities of any person on account of his opinion or belief concerning matters of religion. The respondent, by its action, gives to those who accept as true the religious teachings of King James' version of the Bible, the right of having their children taught a portion of those teachings at the expense of those who do not accept them as true. Can it be for one moment contended that this does not enlarge the civil rights and privileges of persons holding one religious belief, and diminish the civil rights and privileges of persons holding another religious belief? No one surely will contend that the right to be equally taxed is not a civil right. It would be too clear for argument that the legislature could not tax the members of one church for the purpose of teaching the tenets of another church. It is equally clear that it cannot tax those who do not accept the religion of the Bible, for the purpose of teaching the Bible to the children of those who do accept it. It is clear that every parent has an equal right to have his child educated in the public schools. No one would for a moment contend that this right could be conditioned upon the child of immature years being taught a religion which its parents or guardian disapproved. That would clearly enlarge the rights of those who accept that religion, and diminish the rights of those who reject it. Nor is this difficulty remedied by exempting from attendance at these readings the children whose parents object to it. Those parents and those children have equal rights in the schools with the parents and the children of a different religious belief. By exempting them from attendance at the readings of the book, the children are simply deprived of the right of attending school and receiving instruction during the regular school hours. Those who accept the doctrine of the books receive from the public a religious instruction which is denied to those who reject it.

"In reaching the foregoing conclusions I have received no direct aid from the decisions in other States passing upon a similar question.   In the following cases the right to read the Bible in the schools was sustained:   *Moore* v. *Monroe*, 64 Iowa, 367 (52 Am. Rep. 444); *Spiller* v. *Inhabitants of Woburn*, 12 Allen, 127; *Donahoe* v. *Richards*, 38 Me. 379 (61 Am. Dec. 256); *Nessle* v. *Hum*, 1 Ohio, N. P. 140.   In *State, ex rel. Weiss*, v. *District School Board*, 76 Wis. 177 (20 Am. St. Rep. 41), the right to read the Bible in the schools was denied.   In *Board of Education of Cincinnati* v. *Minor*, 23 Ohio St. 211 (13 Am. Rep. 233), it was held that the Cincinnati board of education had authority to exclude the Bible and all religious teachings from the public schools.   In each of these cases the decision turned on the construction of the state constitution.   None of those constitutions had language resembling the constitutional provisions of Michigan herein discussed.   *Moore* v. *Monroe*, 64 Iowa, 367 (52 Am. Rep. 444), is an authority for the proposition that reading the Bible does not make the school a place of worship, within the meaning of the constitution.   Two of the five judges who heard *State, ex rel. Weiss*, v. *District School Board*, 76 Wis. 177 (20 Am. St. Rep. 41), reached an opposite conclusion.   If relator's right depended upon the constitutional prohibition against the passage of a law to compel a person to attend, erect, or support any place of worship, these authorities would be valuable. But as his right is clearly determined by other constitutional provisions, as I have herein indicated, these authorities afford no aid.   I am glad to say, however, that my conclusion is supported by our greatest authority on constitutional law, who was especially familiar with the Constitution of Michigan.   Says Judge COOLEY, in his Constitutional Limitations (pages 575, 576, 6th Ed.):

"'Those things which are not lawful under any of the American constitutions may be stated thus: (1) Any law respecting an establishment of religion.  *  *  *  (2) Compulsory support, by taxation or otherwise, of religious instruction.   Not only is no one denomination to be favored at the expense of the rest, but all support of religious instruction must be entirely voluntary.   It is not within the sphere of government to coerce it.'

"It is urged that relator cannot in his own name, under the authority of *Attorney General, ex rel. Moreland*, v. *Common Council of Detroit*, 112 Mich. 145, and other

similar cases, maintain this suit.   The principle of those
cases was that a private person had no right to seek a
*mandamus* to redress a purely public grievance.   That
principle has no application.   Relator is not in this case
seeking to redress a purely public grievance.   His consti-
tutional civil rights have been violated by respondent, and
he is seeking appropriate redress.   The following cases
are exactly in point, and uphold his right to a *mandamus:*
People v. *Board of Education of Detroit,* 18 Mich. 400;
*Holman* v. *Trustees of School District No. 5 of Avon,*
77 Mich. 605 (6 L. R. A. 534); *Jones* v. *Board of Edu-
cation of Detroit,* 88 Mich. 371.

"It is also urged that relator is not entitled to relief be-
cause it does not appear in his petition that anything in
the book, 'Readings from the Bible,' is contrary to his
opinion or belief concerning matters of religion.   If re-
spondent's action is prohibited by the Constitution, as I
have tried to prove, that action is totally void.   It is not
void as to a part of the people, and valid as to the re-
mainder.   In this State every one has equal constitutional
rights.   Nothing could be more intolerable and out of
harmony with our Constitution than to limit the right of
redress in our courts to those holding certain religious
beliefs.   Any argument leading to such a conclusion needs
no refutation.

"I summarize my conclusions as follows:   Our constitu-
tional provisions respecting religious liberty mean precisely
what they declare.   They forbid any legislative authority
compelling a person to pay taxes for the support of a
teacher of religion, or diminishing or enlarging the civil
rights of any person on account of his religious belief.
Respondent's proposed use of 'Readings from the Bible'
in the public schools is in direct conflict with these constitu-
tional provisions, and relator, whose constitutional rights
are thereby violated, has a right to redress.   A writ of
*mandamus* should issue according to the prayer of the
relator."

The school board has appealed from this decision.   It is
claimed on its part that article 3 of the ordinance of 1787
requires that religion should be taught in the public
schools.   The article reads:

"Religion, morality, and knowledge being necessary to
good government and the happiness of mankind, schools

and the means of education shall forever be encouraged."
1 How. Stat. p. 29.

It is claimed that, by virtue of the enacting clause in
the constitution adopted by the State in 1835, the State
adopted the views expressed in the ordinance. That
clause reads as follows:

"We, the people of the Territory of Michigan,  *  *  *
in conformity to the fifth article of the ordinance provid-
ing for the government of the territory of the United
States northwest of the river Ohio,  *  *  *  and avail-
ing ourselves of the aforesaid ordinance of the Congress of
the United States of the 13th day of July, 1787,  *  *  *
do, by our delegates in convention assembled, mutually
agree to form ourselves into a free and independent State,
by the style and title of 'The State of Michigan,' and do
ordain and establish the following constitution for the
government of the same."

Stated in the language of counsel, the claim is—

"That it was the intention of the framers of this ordi-
nance that the Massachusetts system of schools, with
their teachings of the Christian religion, should be for-
ever established in the Northwest Territory; that Congress
passed it with that intention, and made provisions for its
being so carried out; that it was so understood and prac-
tically construed by the United States government for
over a third of a century; and that the constitution adopted
the same view."

The provisions of our present constitution bearing upon
the question appear in the opinion of the circuit judge,
and it will not be necessary to repeat them here. As I
agree in the conclusion reached by the circuit judge, and
in part for the reasons stated by him, it will not be neces-
sary to restate those reasons.

In any discussion of the subject, it must not be forgot-
ten the attendance of children of school ages, upon some
school where they shall obtain the necessary education
which shall fit them, so far as schools can, for the respon-
sibilities and duties of citizenship, is made by our statutes
compulsory. Taxes, too, are levied upon the citizen's

property, whether he has children or not, for the support of the schools. From the very nature of things, the children of most parents, if educated at all, must be educated in the public schools. These facts must be borne in mind when the provisions of the constitution are read and construed.

If, as counsel claim, it is the duty of the State to impart religious instruction, of what shall the instruction consist? Counsel say it shall be instruction in the Christian religion. Is it so easy, then, to decide what constitutes Christian religion? There is not a community which does not contain evidence, in the many churches which exist therein, that men — religious men — are not agreed as to what constitutes the true Christian religion; and we at once find ourselves involved in a maze of controversy, which cannot fail to be harmful to the interests of the common schools, and greatly to impair their usefulness. If the State is bound to provide religious instruction, it has the right, and it is its duty, to decide in what religious education consists, and to say what shall be accepted as religious truth and what rejected as religious error. This, in so far as relates to schools, can only be decided by the officers under whose control the law places the schools. The result will be, where the Protestants are in the majority, religious teachings acceptable to Protestants will be taught; and so, where the Roman Catholics, or the Hebrews, or people of any other religious belief, or of no belief at all, are in the majority, the minority will find taught to their children doctrines which they regard as error. A statement of the situation would seem to lead to the inevitable conclusion that religious instruction is no part of the duty of the State. Suppose, in a given community, the Roman Catholics are in the majority, and elect the school officers, who in turn hire teachers who are in sympathy with the Catholic church, and, upon the theory that it is the duty of the State to teach religion in its schools, exclude the ''Bible Readings'' in schools, and substitute some book therefor the reading of which would be

approved by all good Catholics, and disapproved by all Protestants, for the reason that it contained teachings calculated to favor the Catholic religion, and to bring the Protestant religion into disfavor; would not the Protestant then object? Will it answer his objection to say the Protestant children may retire from the regular exercises of the schools, and peruse "Readings from the Bible" in private? The Protestant would object to these conditions, and would have a right to object to them. His right is, however, no greater than the right of the Roman Catholic, the Hebrew, or any other who, upon conscientious grounds, objects to the religious teachings inculcated by the reading of this religious book. It was the purpose of our constitutional provision to place all sects and all religions on an equal plane before the law, giving to none preference over the other. To so frame religious instruction or a religious exercise in the public schools as to exclude or tend to exclude any portion of the community from their enjoyment would to that extent make the teaching of the schools sectarian. So far as religious teaching is concerned, the attitude of the schools should be that of neutrality.

The elements of our population are so diverse—comprising, as it does, Protestants, Roman Catholics, Hebrews, atheists, orthodox Christians, heterodox Christians, and all shades of religious belief—that no system of religion can be taught which would not be objectionable to many of them. It is for the interest of society and the State that all citizens should be interested in the public schools of the State; that all pupils of school ages should be instructed therein; and that all citizens should take pride in, and be the active friends of, the schools. In no other way can the doctrines of republicanism and democracy—the equality of all people before the law—be so effectively promulgated as by having the children of the rich and of the poor, the children of eminent ancestry as well as those of humble origin, taught side by side, each made to feel and know that success in the schools comes to the diligent

and worthy. The citizens of the State, irrespective of creed and religious belief, will accord to the public schools their hearty and cordial and loving support, when the schools are engaged in their true province, and content themselves with performing their proper functions. It was doubtless to accomplish this purpose that our constitutional provisions were enacted. The history of the relations of religion and the state shows a continuous evolution. It is not long ago that every government had a system of state religion, calling for the organization and support of churches sustained by a general tax. This was true of several of the States. The unbeliever as well as the believer was compelled to pay taxes in support of teachings he believed to be untrue. In some of the States, belief in the Bible and church membership were prerequisites to the right to vote and to hold office. As time passed, the injustice of this in a republic was seen, and it also came to be believed that the cause of true religion would lose nothing by the most complete separation of church and state. The ordinance of 1787 was much more liberal in its utterances in relation to religious liberty than the existing law in the State of Virginia. At that time the commonwealth of Virginia levied a tax for the support of a state church and an ordained clergy. This was forbidden in the ordinance of 1787, and in none of the States subsequently organized in the territory ceded by Virginia has there ever been a state church, or a body of clergy supported otherwise than by voluntary contributions.

Michigan was originally settled by the French, nearly all of whom were members of the Roman Catholic church. Later a large influx of settlers came from New England, New York, New Jersey, and Pennsylvania, nearly all of whom were members of various Protestant denominations. Still later, large accessions to the population were received from Germany, Ireland, Canada, and many other sources. The religious beliefs of these people were diverse, running all the way from the believers in the inspiration of all that

is written in the Bible to those who say, "I do not know." These people were all citizens, alike interested in the prosperity of the State and its institutions. It is not a far-fetched conclusion to say the framers of our latest constitution understood fully the complex character of our population, and the diversity of religious belief among them. They also understood how important to the welfare of the State was our system of schools, and the education of the children therein, and the necessity of having all the people feel the schools were their schools. As the result of it all, we find the language of our constitution, in its latest utterance, going further in the direction of separating religious instruction from the duty of the State than any language before used in any of the written constitutions. It was evidently the idea that the school system of the State should be so conducted that the children of Catholic and Protestant, Calvinist and Armenian, Hebrew and infidel, might attend its daily sessions, and obtain its benefits, without any discrimination being made in favor of one pupil against another, based upon the religious belief or want of belief of 'the parents. We all agree that children should be carefully educated in religion. They should be taught to fear God and love their fellow men. They should be made familiar with the truths of the Bible. They should be instructed to remember their Creator in the days of their youth, and to observe His commandments. But this is a branch of education which is not within the province of the State. It belongs to the parents, the home, the Sunday school, the mission, and the church.

It is said that the school board has removed all objections to the religious exercise embraced in the stated reading of this religious book by excusing those children whose parents may request it from joining in it. If, under the ordinance of 1787 and the constitution, it is the duty of the schools to teach religion, as counsel claim, it is not easy to see how the schools can abdicate that function, and teach it to some of the pupils, and fail to teach it to the

others.   Neither would this obviate the difficulty growing out of the fact that the money of the taxpayer is taken from him to impart religious instruction of which he does not approve.

It is said that to grant the prayer of the petitioner is, in effect, to say that the schools shall not have the benefit of the lofty truths contained in the Bible, and will be deprived of its many literary and historical excellences.   I cannot agree with this contention.   There is a plain and practical distinction between using these selections from the Bible as the basis for a stated religious exercise, and using extracts from it incorporated into the text-books of the schools because of the moral teaching and literary excellence contained therein.   The passages incorporated in the text-books are not placed there to give them authority as religious doctrines, but because of the excellence of the thought and the beauty of its expression, just as extracts from Virgil and Homer and other ancient and pagan authors are incorporated.   In the case last suggested, it would not for a moment be claimed that the incorporation of these extracts from pagan authors would make the reading of the book containing them instruction in paganism; but suppose a compilation was to be made from the Koran, or from any other book recognized as the basis of any one of the ten great religions of the world, and a stated period of time was set apart daily for the reading of that book; it might then truthfully be urged that pupils were receiving instruction in the religion which was based upon the book which was so read.   If the book so selected was not the Bible, would not the believers in the Bible object, and would they not have a right to object, to the reading of the book so selected, upon the ground that the religion taught by the book was favored in the schools, and the religion taught by the Bible was discriminated against?

Judge Carpenter, in his opinion, made a brief reference to the views expressed in Cooley on Constitutional Limitations.   That learned author states the situation so clearly, I deem it best to quote him more at length.   In the sixth edition (page 571), he says:

"A careful examination of the American constitutions will disclose the fact that nothing is more fully set forth or more plainly expressed than the determination of their authors to preserve and perpetuate religious liberty, and to guard against the slightest approach towards the establishment of an inequality in the civil and political rights of citizens which shall have for its basis only their differences of religious belief. The American people came to the work of framing their fundamental laws after centuries of religious oppression and persecution, which, sometimes by one party or sect and sometimes by another, had taught them the utter futility of all attempts to propagate religious opinions by the rewards, penalties, or terrors of human laws. They could not fail to perceive, also, that a union of church and state, like that which existed in England, if not wholly impracticable in America, was certainly opposed to the spirit of, our institutions, and that any domineering of one sect over another was repressing to the energies of the people, and must necessarily tend to discontent and disorder. Whatever, therefore, may have been their individual sentiments upon religious questions, or upon the propriety of the state assuming supervision and control of religious affairs under other circumstances, the general voice has been that persons of every religious persuasion should be made equal before the law, and that questions of religious belief and religious worship should be questions between each individual man and his Maker. Of these questions, human tribunals, so long as the public order is not disturbed, are not to take cognizance, except as the individual, by his voluntary action in associating himself with a religious organization, may have conferred upon such organization a jurisdiction over him in ecclesiastical matters. These constitutions, therefore, have not established religious toleration, merely, but religious equality; in that particular being far in advance, not only of the mother country, but also of much of the colonial legislation, which, though more liberal than that of other civilized countries, nevertheless exhibited features of discrimination based upon religious beliefs or professions. Considerable differences will appear in the provisions in the state constitutions on the general subject of the present chapter; some of them being confined to declarations and prohibitions whose purpose is to secure the most perfect equality before the law of all shades of religious belief, while some exhibit a

jealousy of ecclesiastical authority, by making persons who exercise the functions of clergyman, priest, or teacher of any religious persuasion, society, or sect, ineligible to civil office; and still others show some traces of the old notion that truth and a sense of duty do not consort with scepticism in religion.    There are exceptional clauses, however, though not many in number; and it is believed that, where they exist, they are not often made use of to deprive any person of the civil or political rights or privileges which are placed by law within the reach of his fellows.    Those things which are not lawful under any of the American constitutions may be stated thus:

"1. Any Law Respecting an Establishment of Religion. The legislatures have not been left at liberty to effect a union of church and state, or to establish preferences by law in favor of any one religious persuasion or mode of worship.    There is not complete religious liberty where any one sect is favored by the state, and given an advantage by law over other sects.    Whatever establishes a distinction against one class or sect is, to the extent to which the distinction operates unfavorably, a persecution, and, if based on religious grounds, a religious persecution.    The extent of the discrimination is not material to the principle; it is enough that it creates an inequality of right or privilege.

"2. Compulsory Support, by Taxation or Otherwise, of Religious Instruction.    Not only is no one denomination to be favored at the expense of the rest, but all support of religious instruction must be entirely voluntary.    It is not within the sphere of government to coerce it.

"3. Compulsory Attendance upon Religious Worship. Whoever is not led by choice or a sense of duty to attend upon the ordinances of religion is not to be compelled to do so by the state.    It is the province of the state to enforce, so far as it may be found practicable, the obligations and duties which the citizen may be under or may owe to his fellow citizen or to society; but those which spring from the relations between himself and his Maker are to be enforced by the admonitions of the conscience, and not by the penalties of human laws.    Indeed, as all real worship must essentially and necessarily consist in the free-will offering of adoration and gratitude by the creature to the Creator, human laws are obviously inadequate to incite or compel those internal and voluntary emotions which shall induce it; and human penalties, at

most, could only enforce the observance of idle ceremonies, which, when unwillingly performed, are alike valueless to the participants, and devoid of all the elements of true worship.

"4. Restraints upon the Free Exercise of Religion According to the Dictates of the Conscience. No external authority is to place itself between the finite being and the Infinite, when the former is seeking to render the homage that is due, and in a mode which commends itself to his conscience and judgment as being suitable for him to render, and acceptable to its object."

It was contended in the case of *Board of Education of Cincinnati* v. *Minor*, 23 Ohio St. 211 (13 Am. Rep. 233), as here, that as Ohio was embraced in the territory ceded by Virginia, and came under the provisions of article 3 of the ordinance of 1787, and as its constitution (article 1, § 7) contained these words, "Religion, morality, and knowledge, however, being essential to good government, it shall be the duty of the general assembly to pass suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, and to encourage schools and the means of instruction,"·it was the duty of the schools to impart religious instruction to the pupils. The court discussed the proposition at length, and said:

"We are brought back to the question, What is the true meaning and effect of these constitutional provisions on this subject? Do they enjoin religious instructions in the schools? and does this injunction bind the courts, in the absence of legislation? We are unanimous in the opinion that both these questions must be answered in the negative. * * * We are told that this word 'religion' must mean 'Christian religion,' because 'Christianity is a part of the common law of this country,' lying behind and above its constitutions. Those who make this assertion can hardly be serious, and intend the real import of their language. If Christianity is a law of the state, like every other law, it must have a sanction. Adequate penalties must be provided to enforce obedience to all its requirements and precepts. No one seriously contends for any such doctrine in this country, or, I might almost say, in this age of the world. The only foundation—rather, the only excuse —for the proposition that Christianity is part of the law of

this country, is the fact that it is a Christian country, and that its constitutions and laws are made by a Christian people. And is not the very fact that those laws do not attempt to enforce Christianity, or to place it upon exceptional or vantage ground, itself a strong evidence that they are the laws of a Christian people, and that their religion is the best and purest of religions? It is strong evidence that their religion is indeed a religion 'without partiality,' and therefore a religion 'without hypocrisy.' True Christianity asks no aid from the sword of civil authority. It began without the sword, and wherever it has taken the sword it has perished by the sword. To depend upon civil authority for its enforcement is to acknowledge its own weakness, which it can never afford to do. It is able to fight its own battles. Its weapons are moral and spiritual, and not carnal. Armed with these, and these alone, it is not afraid nor 'ashamed' to be compared with other religions, and to withstand them single-handed. And the very reason why it is not so afraid or 'ashamed' is that it is not the 'power of man,' but 'the power of God,' on which it depends. True Christianity never shields itself behind majorities. Nero, and the other persecuting Roman emperors, were amply supported by majorities, and yet the pure and peaceable religion of Christ in the end triumphed over them all; and it was only when it attempted itself to enforce religion by the arm of authority that it began to wane. A form of religion that cannot live under equal and impartial laws ought to die, and sooner or later must die.

"Legal Christianity is a solecism,—a contradiction of terms. When Christianity asks the aid of government beyond mere *impartial protection*, it denies itself. Its laws are divine, and not human. Its essential interests lie beyond the reach and range of human governments. United with government, religion never rises above the merest superstition; united with religion, government never rises above the merest despotism; and all history shows us that, the more widely and completely they are separated, the better it is for both. Religion is not—much less is Christianity, or any other particular system of religion—named in the preamble to the Constitution of the United States as one of the declared objects of government; nor is it mentioned in the clause in question, in our own constitution, as being essential to anything beyond mere human government. Religion is 'essential' to much

more than human government. It is essential to man's spiritual interests, which rise infinitely above, and are to outlive, all human governments. It would have been easy to declare this great truth in the constitution, but its framers would have been quite out of their proper sphere in making the declaration. They contented themselves with declaring that religion is essential to good government; providing for the protection of all in its enjoyment, each in his own way; and providing means for the diffusion of general knowledge among the people. The declaration is, not that government is essential to good religion, but that religion is essential to good government. Both propositions are true, but they are true in quite different senses. Good government is essential to religion for the purpose declared elsewhere in the same section of the constitution, namely, for the purpose of mere protection. But religion, morality, and knowledge are essential to government in the sense that they have the instrumentalities for *producing and perfecting* a good form of government. On the other hand, no government is at all adapted for producing, perfecting, or propagating a good religion. Religion, in its widest and best sense, has most, if not all, the instrumentalities for producing the best form of government. Religion is the parent, and not the offspring, of good government. Its kingdom is to be first sought, and good government is one of those things which will be added thereto. True religion is the sun which gives to government all its true lights, while the latter merely acts upon religion by reflection.

"Properly speaking, there is no such thing as 'religion of state.' What we mean by that phrase is, the religion of some individual, or set of individuals, taught and enforced by the state. The state can have no religious opinions, and, if it undertakes to enforce the teaching of such opinions, they must be the opinions of some natural person or class of persons. If it embarks in this business, whose opinion shall it adopt? If it adopts the opinions of more than one man or one class of men, to what extent may it group together conflicting opinions? or may it group together the opinions of all? And, where this conflict exists, how thorough will the teaching be? Will it be exhaustive and exact, as it is in elementary literature and in the sciences usually taught to children? and, if not, which of the doctrines or truths claimed by

each will be blurred over, and which taught in preference to those in conflict? These are difficulties which we do not have to encounter when teaching the ordinary branches of learning. It is only when we come to teach what lies 'beyond the scope of sense and reason'—what from its very nature can only be the object of faith—that we encounter these difficulties. Especially is this so when our pupils are children, to whom we are compelled to assume a dogmatical method and manner, and whose faith, at last, is more a faith in us than in anything else. Suppose the state should undertake to teach Christianity in the broad sense in which counsel apply the term, or the 'religion of the Bible,' so as also to include the Jewish faith; where would it begin? how far would it go? and what points of disagreement would be omitted?

"If it be true that our law enjoins the teaching of the Christian religion in the schools, surely, then, all its teachers should be Christians. Were I such a teacher, while I should instruct the pupils that the Christian religion was true, and all other religions false, I should tell them that the law itself was an *unchristian* law. One of my first lessons to the pupils would show it to be unchristian. That lesson would be: ' Whatsoever ye would that men should do to you, do ye even so to them; for this is the law and the prophets.' I could not look the veriest infidel or heathen in the face, and say that such a law was just, or that it was a fair specimen of Christian republicanism. I should have to tell him that it was an outgrowth of false Christianity, and not one of the 'lights' which Christians are commanded to shed upon an unbelieving world. I should feel bound to acknowledge to him, moreover, that it violates the spirit of our constitutional guaranties, and is a state religion in embryo; that, if we have no right to tax him to support 'worship,' we have no right to tax him to support religious instructions; that to tax a man to put down his own religion is of the very essence of tyranny; that, however small the tax, it is a first step in the direction of an 'establishment of religion;' and I should add that the first step in that direction is the fatal step, because it logically involves the last step.

"But it will be asked, How can religion, in this general sense, be essential to good government? Is atheism, is the religion of Buddha, of Zoroaster, of Lao-tse, conducive to good government? Does not the best government require the best religion? Certainly the best government

requires the best religion.    It is the child of true religion,
or of truth on the subject of religion, as well as on all other
subjects.    But the real question here is not what is the
best religion, but how shall this best religion be secured?
I answer, it can best be secured by adopting the doctrine
of this seventh section in our own bill of rights, and which
I summarize in two words, by calling it the doctrine of
'hands off.'    Let the state not only keep its own hands
off, but let it also see to it that religious sects keep their
hands off each other.    Let religious doctrines have a fair
field, and a free intellectual, moral, and spiritual conflict.
The weakest—that is, the intellectually, morally, and
spiritually weakest—will go to the wall, and the best will
triumph in the end.    This is the golden truth which it has
taken the world eighteen centuries to learn, and which
has at last solved the terrible enigma of 'church and
state.'    Among the many forms of stating this truth as a
principle of government, to my mind it is nowhere more
fairly and beautifully set forth than in our own constitu-
tion.    Were it in my power, I would not alter a syllable
of the form in which it is there put down.    It is the true
republican doctrine.    It is simple and easily understood.
It means a free conflict of opinions as to things divine;
and it means masterly inactivity on the part of the state,
except for the purpose of keeping the conflict free, and
preventing the violation of private rights or of the public
peace.    Meantime the state will impartially aid all parties
in their struggles after religious truth, by providing
means for the increase of general knowledge, which is
the handmaid of good government, as well as of true relig-
ion and morality.    It means that a man's right to his
own religious convictions, and to impart them to his own
children, and his and their right to engage, in conformity
thereto, in harmless acts of worship towards the Almighty,
are as sacred in the eye of the law as his rights of person
or property, and that, although in the minority, he shall
be protected in the full and unrestricted enjoyment thereof.
The 'protection' guaranteed by the section in question
means protection to the minority.    The majority can pro-
tect itself.    Constitutions are enacted for the very pur-
pose of protecting the weak against the strong; the few
against the many."

Never at any time in the history of the world was there
as much pure religion as today.    In no country in the

world are religious truths more generally entertained than in our own. In no country in the world is there so complete a separation of the church and state as with us. The growth of religious truth is encouraged by the growth of religious freedom. These things were recognized and acted upon by the framers of our organic law. The religious belief of all persons was not simply tolerated, but was placed upon an equality, by them.

The judgment should be affirmed.