STATE OF NEBRASKA, EX REL. DANIEL FREEMAN, V. JOHN SCHEVE ET AL.*

FILED OCTOBER 9, 1902. No. 11,351.

Commissioner's opinion, Department No. 3.

Religious Exercises in a Public School: BIBLE-READING: SINGING HYMNS: PRAYER: SECTARIAN DOCTRINE: CONSTITUTION. Exercises by a teacher in a public school in a school building, in school hours, and in the presence of the pupils, consisting of the reading of passages from the Bible, and in the singing of songs and hymns, and offering prayer to the Deity in accordance with the doctrines, beliefs, customs or usages of sectarian churches or religious organizations, is forbidden by the constitution of this state.

ERROR from the district court for Gage county. Tried below before LETTON, J. Reversed.

In the year 1899, Miss Edith Beecher was a teacher employed in the public school of district numbered 21, in Gage County, Nebraska. She asked and obtained leave of the school board to have religious exercises in her school. Under the license she prayed, read the Bible and with her scholars sang gospel hymns. This was objected to by Daniel Freeman, a resident of the district, whose children attended the school. The matter was referred to William R. Jackson, state superintendent, for a ruling. He rendered the following decision:

"LINCOLN, NEBR., Nov. 25, 1899.
"Mr. H. D. Odell, Director, Beatrice, Nebr.

"DEAR SIR: I am in receipt of your letter of the 23d inst., in which you set forth that a mandamus suit has

*Opinion filed denying motion for rehearing. See page 876.

been instituted against the school board of district No. 21 of Gage county to compel said board to stop the reading of the Bible or singing religious songs.

"In setting forth the conditions and facts in the case, you show that the plaintiff has heretofore succeeded in stopping the reading of the Bible, and by so doing has caused several good teachers to refrain from applying for your school. You state that nearly all in the district are in favor of allowing the teacher the privilege of having her opening exercises, and that you find no one opposed to it outside of the family of the plaintiff. The exercises you say consist merely of the teacher's reading from the Bible and repeating the Lord's prayer, and in a few instances of having singing from the gospel or pentecostal hymns and offering a prayer of her own composition. You inquire, 'Am I (considering the above facts) using good judgment as a member of the school board in refusing to interfere with the teacher's opening exercises?'

"I desire to say in reply that in a district where the sentiment is unanimously in favor of devotional exercises, such as reading a chapter from the Bible and repeating the Lord's prayer, there can be no question as to the right and propriety of such exercises, especially when the reading of the Bible is without any comment. I do not mean to say that it would be proper to require pupils to conform to any religious rite or observance, or to go through with any religious forms or observances inconsistent or contrary to their religious convictions or conscientious scruples. Such a requisition would be a violation of the spirit of the clause in the constitution which prohibits sectarian instruction. The word 'sectarian,' as defined by Webster, is 'pertaining to a sect, or to sects; peculiar to a sect; bigotedly attached to the tenets and interests of a denomination; as sectarian principles or prejudices.' Whether or not any particular kind of religious service at the opening of school work would constitute sectarian instruction would depend upon the character of the exercises, and would be a question of fact to be determined

in each individual case. As, for instance, a prayer might be so offered as to be sectarian, but it is not necessarily so, and in general is not. The same may be said of the singing. The Bible surely can not be considered as falling within the category of sectarian books. Indeed, the Bible is the rarest and richest book in the department of thought and imagination which exists. In its poetry, its history, its oratory and its logic, it rises into the solitude of matchless pre-eminence. It is a library in itself. It has been the inspiration of more literature than any ten thousand other books put together. The vitality of Shakspere comes from the moral convictions of the Bible. It may be pitted against all the books of all the libraries, out of all races and out of all ages, and on all the subjects it proposes to handle, and in all the lines of literature it touches it will discount them all many fold. Shall pupils be deprived of hearing read in our schools the book which is the greatest classic of our literature, the book which touches and crowns all other branches of knowledge, and is the most widely studied book in the world to-day? If we were to take the Bible quotations, direct and indirect, from our literature and our laws, we would divest them from nearly all that is high and noble. There is no other book so calculated to impress on the minds of children and youth the principles of piety and justice and the sacred regard for truth. There seems to be nothing in the laws of Nebraska that would prevent the simple reading of the Bible in our public schools. Judge H. M. Edwards of Scranton, Pa., has decided that there is nothing in the laws of Pennsylvania to prevent the reading of the Bible in the public schools. He says: 'The reading of the Bible in the public schools may be allowed, and even commended, from a standpoint which does not involve the question of sectarian instruction nor the rights of conscience. It is conceded by men of all creeds that the Bible teaches the highest morality apart from religious instruction. It must be admitted that sound morality is one of the

foundations of good character. An education which does not involve the inculcation of moral principles is incomplete. And why can not the common precepts of morality be taught by the reading of the Bible better than in any other way? Furthermore, there is much in the Bible which can not justly be characterized as sectarian. There can be no valid objection to the use of such matter in secular instruction of the pupils. Much of it has great historical and literary value, which may be utilized without violating the constitutional prohibition. It may also be used to inculcate good morals—that is, our duties to each other—which may and ought to be inculcated by the district schools. No more complete code of morals exists than is contained in the New Testament which reaffirms and emphasizes the moral obligations.' Section 4, article 1, of the constitution of Nebraska, recognizes 'religion, morality and knowledge' as 'being essential to good government.' I am, therefore, of the opinion that in this enlightened age and Christian land the public school teacher ought not to be deprived of reading, without written or oral comment, the Bible or of repeating the Lord's prayer.

"Very respectfully, W. R. JACKSON,

"*State Superintendent.*"

Daniel Freeman, sixteen days before the foregoing letter was written, had commenced this action in the district court for Gage county. The decision of the judge at *nisi prius* was to the effect that the matter of text-books, etc., to be used in public schools was to be determined by the school board, and, except in a case of abuse, the court would not attempt to control their discretion.—W. F. B.

*Franklin J. Griffen* and *Richard S. Horton*, for plaintiff in error:

We desire, before quoting the sections of the constitution upon which we rely, to refer generally to the growth of the question now before us. Long before the time of Wyclif, and Luther, the world was dominated by one system of theology. There was one church, and that church

all powerful. After the appearance of Wyclif, Luther and others like them, some of the dogmas of the church were questioned. This resulted in a division of the church into two hostile camps. A struggle began and lasted through the centuries. Honest difference of opinion was not conceded. Whichever party gained the ascendency, attempted to suppress the other with persecution. Nations were involved, wars ensued. In England, the period of the Stuarts, the Commonwealth and Protectorate were distinguished for religious controversy. The English colonies in America were settled by refugees from Europe. Though many of these fled from persecution in Europe, the history of some of the colonies shows a record hardly inferior in zeal to Torquemada or Louis XIV. Roger Williams, the Baptist dissenter, who founded Rhode Island, is well known as one of the few men who questioned the right of the state to interfere with religious conviction. In religious liberty Virginia took the lead. Massachusetts, Connecticut and New Hampshire kept up religious persecution. At the convention called to frame our national constitution were people of variant religious opinions. They could agree on no state religion. The first article of the Bill of Rights—the first ten amendments to the United States constitution—expressly prohibited the national government from exercising such power. Since that time, Madison's maxim, "Religion is not within the purview of human government," has become the settled doctrine in this country. Through a gradual evolution the separation of church and state has finally become established. The result of the growth of religious liberty has been enactments in the different states forbidding the enforced attendance and support of religious worship, and prohibiting sectarian instruction in the public schools. These enactments have not been at the instigation of any sect, or at the demand of any body of persons who did not believe in any religion. They represent the crystallized opinion of Jews, of Catholics, of Protestants, of Agnostics and of various beliefs. These enactments

have become the law of the land, and it is the right of any citizen, whether a believer or unbeliever, to insist upon their enforcement. The reading of the Bible in public schools is simply a relic of the early days which we have outgrown. Any citizen of Nebraska is entitled to invoke the aid of the courts to prevent the violation of the constitution. [Here were cited the parts of the constitution quoted in the opinion of Commissioner AMES.]

The court will take judicial notice of these facts: (1) that the religious world is divided into a large number of sects; (2) that there are material differences between them; (3) that there are Jews, Catholics and Protestants; (4) that the Douai edition (Catholic) of the Bible differs materially from the King-James (Protestant) version; (5) that Catholic and Protestant each have dogmas not believed in by the other; (6) that Protestants are divided into numerous sects; (7) that the Bible of the Jews does not include the New Testament. *State v. Board,* 76 Wis., 177.

It is well to keep in mind that the exercises complained of by the petitioner did not consist simply in reading the King-James version of the Bible, but, also, in offering up prayers and singing religious songs. It will be observed that the facts in the case at bar show more clearly than do the facts in any case hereinafter cited that the exercises complained of constitute sectarian instruction and worship. As stated by Judge Taft,* at *nisi prius,* in *Board of Education v. Minor:* "The singing of Protestant hymns may be used to communicate dogmatic instruction as effectually as the Bible itself. I can not doubt, therefore, that the use of the Bible, with the appropriate singing provided for by the old rule, and as practiced under it, was and is sectarian. It is Protestant worship, and is used as a symbol of Protestant supremacy in the schools, and as such is offensive to Catholics

---

*Alphonso Taft, judge of the superior court of Cincinnati, father of William H. Taft, formerly United States judge of sixth circuit and afterwards commissioner to the Philippines.—W. F. B.

and Jews.  *  *  *  The facts on which this question turns are simple. The Roman Catholic denomination has a different version of the Bible, and includes the apocrypha as a part of it, which is excluded from the Protestant Bible. The Protestant is the King-James version which the Catholics regard as not only not a correct translation, but as distorted in the interest of the Protestant as against the Roman Catholic church. They object, therefore, on conscientious grounds to having their children read it. * * * We are not at liberty to doubt the conscientious objections on the part of the Catholic parents to placing their children in schools while the schools are opened by the reading of the Protestant Bible. Like the majority of us, the Jews have received their faith from their ancestors, and according to that historic faith, the assertion in the New Testament that Jesus of Nazareth is God is blasphemy against the God of Israel. If the Protestant Christian would object to having the common schools daily opened with the forms of worship peculiar to the Catholic church, which worships the same triune God with him, how much more serious must be the objection of the Jew to being compelled to attend or support the worship of a being as God, whose divinity and supernatural history he denies?"

Suppose in a public school a Catholic teacher reads from the apocrypha in the Douai version, 2 Maccabees, 12th chapter, verses 44 and 45, that it was a duty to "pray for the dead that they may be loosed from their sins"; what view would the Protestant take of the provision in our state constitution against sectarian instruction in our public schools?

Under the statute the children of relator are bound to attend some public or private school for a certain period of each year. Reading the Bible is an act of worship within the meaning of the constitution, and a taxpayer of the school district has a right to object to the reading of the Bible in the public schools under the constitutional provision that "no man shall be compelled to attend, erect

or support any place of worship." *State v. Board*, 76 Wis.,
177. So they have to choose between a private school
and a place of worship.

The use of a public school building for religious pur-
poses is illegal and can be prevented upon the application
of an objecting taxpayer. *Scofield v. School District*,
27 Conn., *499; *Spencer v. School District*, 15 Kan., 259;
*Dorton v. Hearn*, 67 Mo., 301; *Weir v. Day*, 35 Ohio St.,
143; *School District v. Arnold*, 21 Wis., 657; *State v. Dis-
trict Board*, 76 Wis., 177.

*Ernest O. Kretsinger*, contra, cited *Donahoe v. Richards*,
38 Me., 379; *Commonwealth v. Cooke*, 7 Am. Law Reg.
[Mass.], 417; *Spiller v. Woburn*, 12 Allen [Mass.], 127;
*Ferriter v. Tyler*, 48 Vt., 444; *Stevenson v. Hanyon*, 7 Dis-
trict Court Reports [Pa.], 585; *Vidal v. Girard's Execu-
tors*, 2 Howard [U. S.], 126, 200; *Pfeiffer v. Board of
Education*, 118 Mich., 560; *Nichols v. School Directors*,
93 Ill., 61; *Millard v. Board*, 121 Ill., 297; *McCormick v.
Burt*, 95 Ill., 263; *North v. Trustees*, 137 Ill., 296; *Town-
send v. Hagan*, 35 Ia., 194; *Davis v. Boget*, 50 Ia., 11;
*Moore v. Monroe*, 64 Ia., 367; *Nessle v. Ham*, 1 Ohio Nisi
Prius, 140. Reference is also made to the letter of Hon.
Samuel Maxwell commending the ruling of State Super-
intendent Jackson in this very affair of Freeman. Judge
MAXWELL was a member of the convention that framed
our constitution; and should be accepted as an authority.

The discretion of the district school board will not be in-
terfered with by the court. *Board of Education v. Minor*,
23 Ohio St., 211.

A constitutional provision concerning religious freedom
should be construed in relation to the state of the law as
it existed at the time of its adoption, and the courts can
take judicial notice of customs and usages in regard to the
use of the Bible in public schools. *Pfeiffer v. Board of
Education*, 118 Mich., 560.

The right to prescribe the general course of instruction
and to direct what books shall be used must exist some-

where.   The legislature have seen fit to repose the authority to determine this in the school board.   They may therefore, and rightfully, exercise it.   *Donahoe v. Richards,* 38 Me., 379, 398; *Ferriter v. Tyler,* 48 Vt., 444; *Millard v. Board,* 121 Ill., 297.

A regulation of a school board requiring pupils in the public schools to learn the ten commandments and repeat them once a week, is not a violation of the constitutional guaranty of liberty of conscience and of worship.   *Commonwealth v. Cooke,* 7 Am. Law Reg., 417.   April, 1859.

Worship in public school is not an infringement of constitutional liberty, where pupils are neither required to take part or be present.   *Moore v. Monroe,* 64 Ia., 367.

The executive department of the state of Nebraska (the department of public instruction) has constantly held that the Bible may be read and the Lord's prayer repeated in the public schools of this state.   This holding has the force of law till reversed by the courts.   Compiled Statutes, ch. 79, sec. 4, subdiv. 8.

Religion, morality and knowledge, however, being essential to good government, it shall be the duty of the legislature to pass suitable laws to protect every religious denomination in the peaceable enjoyment of its mode of public worship, and to encourage schools and the means of instruction.   Constitution, art. 1, sec. 4.

The opinion of Judge Lyon in *State v. Board,* 76 Wis., 177, is illogical and inconsistent.

The constitutional provision was designed to secure the citizen against taxation for religious purposes, and not for the purpose of suppressing religion itself; and it does not afford a ground for enjoining religious exercises in the public school, where it appears that the burden of taxation is not thereby increased, and that plaintiff's children are not required to be present at, nor to take part in, such exercises.   *Moore v. Monroe,* 64 Ia., 367.

*Franklin J. Griffen* and *Richard S. Horton,* in reply:
The rule of contemporaneous and practical construction

relied upon by defendants in error has no application where the constitutional provision is plain and unambiguous as in the case at bar. *State v. Cornell,* 60 Nebr., 276; *State v. Board,* 76 Wis., 177; Cooley, Constitutional Limitations [6th ed.], p. 84; *Board of Education v. Minor,* 23 Ohio St., 211.

An examination of the authorities cited by the defendants in error, will show them inapplicable to the case at bar. Not a single one of the authorities cited is under a constitutional provision prohibiting sectarian instruction in public schools.

*Wilbur F. Bryant* and *John H. Lindale, amici curiæ:*

We beg leave to call attention to the danger which threatens the rights of a large body of people who constitute an important part of our citizenship, the membership of a great church. They have the same rights as other people—no more, no less. We refer to the Roman Catholics of Nebraska. The fact that we have church and state separated in this country is the result of a compromise. When the constitution was formed, there were Congregationalists in New England, Dutch Reformers in New York, Lutherans in New Jersey, Quakers in Pennsylvania, Catholics in Maryland, Methodists in Georgia, Calvinists in South Carolina, Episcopalians in Virginia, and everything and what not in North Carolina. In order that all should be on an equal footing, it was provided that congress should make no law respecting an establishment of religion, or prohibiting the free exercise thereof. This was in the first amendment, and, with the freedom of the press and right of petition, constituted the first article of the Bill of Rights, as the first ten amendments are styled. Under this Bill of Rights—under this provision—this spirit of mutual toleration gradually filtered down into the public conscience; and the constitution of the several states adopted similar provisions. Thus have religious denominations—all and singular—acquired vested rights. This doctrine is the very genius of our institutions.

Our own state constitution provides: "All persons have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No person shall be compelled to attend, erect or support any place of worship against his consent, and no preference shall be given by law to any religious society, nor shall any interference with the rights of conscience be permitted." Bill of Rights, sec. 4.

Compulsory education has been in force in this state from time immemorial. It is only necessary to refer to the act of March 30, 1901, to subdivision 16 of chapter 79 of the Compiled Statutes of 1899, and the other links in the chain. If the Bible is used in public schools, if hymns are sung, and if children are compelled to attend school, you compel attendance at a place of worship, which is contrary to the constitution. Hymns are but prayers in metre. But the Bible, you say, is common to all Christians. The Catholic yields to no one in his reverence for the word of God. In a recent editorial in the New York *Sun*, the following paragraph appears:

"As it is now, the Pope is the sole, bold, positive and uncompromising champion of the Bible as the word of God."

The Catholic church has condemned the so-called "higher criticism," which is nothing but Tom Paine in a parson's cassock. The Catholic must take his gospel straight with no sugar-coating, or let him be anathema. But we do not intend to have James Stuart's translation forced down our throat without protest. It would savor of pedantry and would serve no useful purpose to point out the difference between the King-James version and the Douai version. We do not ask to have the Douai edition read in our schools; we do not think it proper. If we should ask it, what a howl would go up all over the land— such a howl as made the welkin ring when a nun baptized the dying Thaddeus Stevens, at his own request—"The arrogance of Rome!" It does make a difference whose ox is being gored. "Orthodoxy is my doxy and heterodoxy

is your doxy," has been the song of every religious tyrant from Jew-burning Torquemada to witch-hanging Cotton Mather.

In 1854, a Know-nothing supreme court down in the state of Maine unburdened itself of the following morsel of erudition: "But reading the Bible is no more an interference with religious belief than would reading the mythology of Greece or Rome be regarded as interfering with religious belief or an affirmance of the pagan creeds." *Donahoe v. Richards*, 38 Me., 379, 399.

This is not a fair illustration. Courts are bound to know, without proof, matters of general knowledge and to take cognizance of historical facts. The gods of Olympus are back numbers; nobody believes in them. It is safe to say that, for fourteen centuries, nobody has believed in them. The difference between Homer and the Bible is the difference between a dead wire and a live wire. You can not disassociate any version of the Bible from religion. Any attempt to run the blockade under the literary flag, reminds one of Petroleum V. Nasby's definition of a conservative: "A man who takes a roundabout way to get at a devilish mean thing." In regard to the ridiculous idea that Catholic children can be evicted while the Bible is being read, it is only necessary to refer to the reasoning in *State v. Board*, 76 Wis., 177, opinion of Orton, J., pp. 219, 220.

The counsel for defendant in error had the assurance to cite *Commonwealth v. Cooke*, 7 American Law Register, o. s. [Mass.], 417, Police Court of Boston. The history of forensic effort affords no more pitiful sight than this Sisyphean attempt to elevate a piece of oracular asininity delivered by a Tombs-magistrate, to the plane of a judicial decision. This case reads like Llorente's History of the Spanish Inquisition. It all happened in the city which—the self-same year—wailed over the execution of John Brown, like Rachel weeping for her children, which shed crocodile tears over Uncle Tom's Cabin, which—five years before—had raised a mob headed by two Protestant min-

isters to kill a deputy United States marshal, in an abortive attempt to rescue Anthony Burns.   From the maudlin mock-philanthropy and Pecksniffian hypocrisy of the sniveling, whining, senile and pharisaical Puritan, good Lord deliver us!

Counsel, for both relator and respondent, have marshalled an array of authorities which are numerically, if not substantially, formidable.   There are above thirty of them in the United States, which have been cited and are recited at every coming of a case, involving this question, before a court of last resort.   These authorities, in their use, are about equally divided between the sheep and the goats.   Some of these are not cited by either counsel in this case.

In determining the weight of these decisions, two things are necessary:  (1) A careful examination of the constitution and statute under which the decision was made; (2) a thorough sifting of *facta*—matters absolutely decided— from judicial eloquence and irrelevant *dicta* which too often befog many of the opinions.

Taking the decisions cited by counsel it will be found that in *Ferriter v. Tyler, Donahoe v. Richards, Commonwealth v. Cooke, Minor v. Board of Education, Pfciffer v. Board of Education, McCormick v. Burt* and *Nessle v. Ham,* 1 Ohio Nisi Prius, 140, the court places the entire responsibility upon that *"quasi*-judicial" body the board of education.   It is true much learning is wasted in arriving at this simple decision, but here it is in a nut-shell.

In *Scofield v. School District, Weir v. Day, School District v. Arnold, Nichols v. School Directors, Davis v. Boget, Dorton v. Hearn, Spencer v. School District* and *Townsend v. Hagan* the question is not the constitutional use of public funds, but of *ultra vires*—the power of a corporation (school district), or its officers, to divest the use of public property from the purpose of the corporation, that is, from an educational to a religious purpose.   In but two of these cases is the constitutional question discussed—*Nichols v. School Directors* and *Davis v.*

62

*Boget;* and, in each case, the court appears to have disposed of it under the maxim: *De minimis non curat lex.*

In *Spiller v. Woburn* the question really before the court was: Is the bowing of the head during prayer, an act of decorum or an act of worship?

*Millard v. Board* was decided on a question of pleading.

In *Moore v. Monroe* the court placed the responsibility with the teacher.

In *Vidal v. Girard's Executors* no such question is raised. Girard college was not a public or state school in the sense that term is used when applied to the common schools. The question concerned a charitable trust.

In *North v. Trustees* the plaintiff had forfeited all rights by his laches.

In *Stevens v. St. Mary's Training School,* 144 Ill., 336, *State v. Board* and *State v. Hallock,* 16 Nev., 973, the word "sectarian" is construed and held to be used in the popular sense as in *State v. Board, infra.*

In only seven of the cases decided (*Donahoe v. Richards, Stevenson v. Hanyon, Minor v. Board of Education, Pfeiffer v. Board of Education, Moore v. Monroe, McCormick v. Burt, Nessle v. Ham*) was the question of the use of the Bible as a text-book directly raised. The other decisions must be applied by parity of reasoning.

The decision in *State v. Board* by the supreme court of Wisconsin and Judge Moore's dissent in the *Pfeiffer Case* [Mich.] are the only instances where a court of last resort or any judge thereof had met and squarely decided the constitutional question as to the use of the Bible in public schools. The decision in Wisconsin has now been adopted by the attorneys general of two states, respectively, Minnesota and Washington, and is recognized law in those jurisdictions.

Is the Bible sectarian or literary? The pivotal question in this case is the construction of the word "sectarian." The earliest construction of the word we have been able to find, is in *Muzzy v. Wilkins,* Smith [N. H.], 1, decided in 1803; and is to the effect that the word "sect" and its

derivatives, with all distinctions thereby created and designated, relate to difference in government, discipline and worship, but not in faith.  If this definition is correct, we are free in our confession that James's version is still a sectarian book, as much so as the Episcopalian's Book of Common Prayer, the Methodist Discipline or the Lutheran Year Book.

If King James's version of the Bible is to be used as a literary text-book, why not enter the same plea for Voltaire's Candide?  There are few books that exceed that immortal work in literary merit.  This plea might have some weight as to a university.  But when applied to a six-year-old child in a rural district school, it is puritanical nonsense.

The case was argued orally by *Griffen, Horton* and *Timothy J. Mahoney,* for plaintiff in error, and by *Kretsinger* for defendant in error.

*Lindale, amicus curiæ,* did not appear.  *Bryant,* being an officer of the court, also made no oral argument.

*Mahoney:* The pivotal question is how should the terms "sectarian instruction" (Constitution, art. 8, sec. 11), "interference with the rights of conscience," and "place of worship" .(Constitution, art. 1, sec. 4), be construed? To the Jew, the entire New Testament is sectarian.  To the Catholic the revealed word of God consists of tradition or the unwritten word, and the Scriptures, all as interpreted by the church; just as to the lawyer the law of this state consists of the unwritten, or common law, and the statutes, all as interpreted by this court.  On the other hand it is of the essence of Protestantism to deny tradition (the common law), and to repudiate the authority of the church (the supreme court) to interpret the Scriptures. To read the Bible as *the* revealed word of God without authoritative note or comment is to inculcate the Protestant idea that the Scriptures contain *all* the revealed word and that each should be his own supreme court to interpret

them. Such inculcation amounts to instruction, and as it is instruction according to the Protestant doctrine and against the Catholic doctrine, it is "sectarian instruction," forbidden by section 11 of article 8 of the constitution. To the Catholic it is a matter of conscience to read, with the Scriptures, the authoritative notes and comments of his church, and to require a Catholic pupil to take part in, or listen to the reading of a version which he does not accept as the Bible, and without the interpretation of his church is an "interference with his rights of conscience" (Constitution, art. 1, sec. 4). Such reading as a devotional exercise is an act of worship, and to compel a Catholic child to attend such worship or a Catholic taxpayer to support such place of worship is a violation of section 4, article 1 of our constitution.

*Kretsinger:* We insist that some copy of the Bible ought to be read in the school. We have no objection to the Douai version.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

The Bible should be read as a masterpiece of literature; as such King James's version is admittedly superior to the Douai version.

The action of the relator was not at any particular version of the Bible, but at Christianity itself—the very foundation, ground-work and corner-stone of civilization itself.

The genius of our institutions was not created by infidels of the Freeman type, but by men who revered the Book as the common law of our faith, the Pharos of civilization and the index to a higher, a better and a purer life. Religion, morality and knowledge are joined together in the words of our constitution, for their betterment and perpetuity; it is the duty of the legislature to encourage schools. Is it possible that in our schools and universities Plato, Kant and Felix Adler will be welcome guests, while Jesus of Nazareth is an outlaw? And all this because it will not do to tread on the sensitive corns of

Daniel Freeman?   As a matter of state policy this writ should be denied.   No more serious problem confronts the American people today than the proper government of our great cities.   Vice, crime, degradation, want and official corruption exist to an alarming extent there.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

If the moral principles that Miss Beecher attempted to teach the pupils in her school were thoroughly taught and instilled into the minds of the youth of our cities, there would be a wonderful municipal reformation.   Certainly no harm has come to the goodly city of Beatrice; civil and religious liberty exist there.   If the private conscience of any man, good or bad, is allowed to dictate a school curriculum, where will this thing end?

AMES, C.

Section 4 of article 1 of the constitution of this state is as follows: "All persons have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences.   No person shall be compelled to attend, erect or support, any place of worship against his consent, and no preference shall be given by law to any religious society, nor shall any interference with the rights of conscience be permitted."   Section 11 of article 8 of the constitution reads as follows: "No sectarian instruction shall be allowed in any school or institution supported, in whole or in part, by the public funds set apart for educational purposes."   Daniel Freeman is a resident taxpayer and a patron of the public school in school district No. 21 in Gage county.   He applied for and obtained an alternative writ of mandamus running to the school board of said district, alleging that against his protest and in disregard of his objections and in opposition to his demands, the board permitted a teacher employed by them in said school to engage daily, in school hours, in the public school building in said district, and in the presence of the pupils, in certain religious and sectarian exercises, consisting of the reading of passages of her own selection from a book com-

monly known as King James's version or translation of
the Bible, and in singing certain religious and sectarian
songs, and in offering prayer to the Deity according to the
customs and usages of the so-called orthodox evangelical
churches of this country, and in accordance with the belief
and practices of such churches, the pupils joining in the
singing of such songs or hymns. The return to the writ
admitted the foregoing recited facts, except that it denied
that the exercises complained of were sectarian; but the
teacher, who was produced as a witness, admitted that she
regarded them as constituting a religious worship, and
that she conducted them solely for that reason. That they
are correctly so described there can be no doubt. Protest-
ant sects who maintain, as a part of their ritual and disci-
pline, stated weekly meetings, in which the exercises con-
sist largely of prayers and songs and the reading or repeti-
tion of Scriptural passages would, no doubt, vehemently
dissent from the proposition that such exercises are not
devotional, or not in an exalted degree worshipful, or not
intended for religious edification or instruction. That
they possess all these features is a fact of such universal
and familiar knowledge that the courts will take judicial
notice of it without formal proof. That such exercises are
also sectarian in their character is not less free from doubt.
For more than three centuries it has been the boast and
exultation of the Protestants and a complaint and griev-
ance of the Roman Catholics that the various translations
of the Bible, especially of the New Testament, into the
vernacular of different peoples, have been the chief con-
troversial weapons of the former, and the principal cause
of the undoing of the latter. For the making of such
translations Wyclif, Luther, Tyndale and others have been
commended and glorified by one party, and denounced and
anathematized by the other. Books containing such trans-
lations have been committed to the flames as heretical, and
their translators, printers, publishers and distributers
persecuted, imprisoned, tortured, and put to death for par-
ticipating in their production and distribution. The sev-

eral popular versions differ in some particulars from each
other, and all differ from the Catholic canon, both in ren-
dition of passages from which sectarian doctrines are de-
rived by construction, and in the number of books or gos-
pels, constituting what is regarded as the written record
of Divine revelation.  In addition to this, there are persons
who are convinced, upon grounds satisfactory to them,
that considerable parts of the writings accepted by all Pro-
testant denominations are not authentic, while devout
Hebrews maintain that the New Testament itself is not
entitled to a place in the true Bible.  These diverse opin-
ions have given rise to a great number of religious sects
or denominations.  To some of these sects the reading in
public of any portion of any version of the Scriptures un-
accompanied by authoritative comment or explanation, or
the reading of it privately by persons not commissioned so
to do by the church, is objectionable, and an offense to
their religious feelings; to some, the utterance of public
prayer, except recitations from Scripture, is a vain and
wicked act; and to some, the songs and hymns of praise in
which others engage are a stumbling-block and an offense.

We do not think it wise or necessary to prolong a dis-
cussion of what appears to us an almost self-evident fact,
—that exercises such as are complained of by the relator
in this case both constitute religious worship and are
sectarian in their character, within the meaning of the
constitution.  Nor do we feel inclined to make what might
be looked upon as a spurious exhibition of learning by
quoting at length from the many judicial decisions and
utterances of eminent men in this country concerning the
subject.  Perhaps the case most nearly in point, because
of similarity both of facts involved and of constitutional
enactments construed to those in the case at bar, is *State
v. District Board,* 76 Wis., 177, 44 N. W. Rep., 967.  There
are three separate and concurring opinions in this case by
three of the eminent judges of that court.  The discussion
includes a thorough review of both the legal principles in-
volved, and of the historical aspects of the controversy,

and, for the most part, and in essential particulars, voices our own views. We think it, therefore, sufficient for our purpose to direct attention to that authority.

But there is another matter deserving of consideration in this connection. Secular education of children within prescribed ages is, by a statute of this state, made compulsory. Punctuality and regularity of attendance at the time fixed for the beginning of and throughout the daily sessions of a district school are of first importance, both as measures of discipline and for the development of a trait, or the formation of a habit, of extreme importance to the students in after-life. Very justly, and almost, if not quite, necessarily, pupils are required to conform to these regulations, or incur the penalty of loss of rank in deportment and scholarship. Unless opinions of universal acceptance in this country since the foundation of our government are at fault, it is a policy of the highest importance that the public schools should be the principal instruments and sources of popular education, because they exert, more than any other institution, an influence promotive of homogeneity among a citizenship drawn from all quarters of the globe. But if the system of compulsory education is persevered in, and religious worship or sectarian instruction in the public schools is at the same time permitted, parents will be compelled to expose their children to what they deem spiritual contamination, or else, while bearing their share of the burden for the support of public education, provide the means from their own pockets for the training of their offspring elsewhere. It might be reasonably apprehended that such a practice, besides being unjust and oppressive to the person immediately concerned, would, by its tendency to the multiplication of parochial and sectarian schools, tend forcibly to the destruction of one of the most important, if not indispensable, foundation stones of our form of government. It will be an evil day when anything happens to lower the public schools in popular esteem, or to discourage attendance upon them by children of any class.

The district court, without consideration of the merits of the controversy, adjudged a dismissal of the suit upon the ground that the practices complained of were so far within the discretion of the district board as not to be subject to control by mandamus. In that opinion we were— or at least the writer was—at first inclined to concur. More mature reflection has, however, convinced us that this view is erroneous. The administration of the public funds for educational purposes is entrusted solely to these boards, and the nature of their office, we think, especially enjoins upon them the duty of seeing to it that the constitutional prohibition is observed.

It may be unnecessary to remark that neither the writer nor the court is intended to be committed to any view of any of the matters of theological or exegetical controversy touched upon in the foregoing discussion. All that is intended to be said is that such matters, being the subjects of sectarian differences, are excluded by the express words of the constitution from being taught, or in any degree countenanced, in educational institutions maintained to any extent by the public funds. It is the function of the court to expound, not religious creeds or writings, but the constitution and laws of the state. We are of opinion that the return does not state facts sufficient to constitute a defense to the alternative writ, and it is recommended that the judgment of the district court be reversed, and that a peremptory writ as prayed issue from this court to the respondents and their successors in office.

DUFFIE and ALBERT, CC., concur.

By the Court: For reasons stated in the foregoing opinion, it is ordered that the judgment of the district court be reversed, and that a peremptory writ as prayed issue from this court to the respondents and their successors in office.

REVERSED.

SEDGWICK, J.

I concur in the conclusion reached by the commissioners solely on the ground that the exercises complained of were "sectarian instruction" within the meaning of the constitution.

HOLCOMB, J., concurring specially.

I concur in the foregoing opinion in so far as it is held therein that the exercises which it is sought to have eliminated as conducted in the district school in which respondents are school officers violate the constitutional provision declaring that no sectarian instruction shall be allowed in the public schools. As to the views apparently entertained and held to in the opinion to the effect that the exercises complained of constitute thereby the schoolhouse a place of worship within the meaning and contrary to the section of the constitution wherein it is ordained "no person shall be compelled to attend, erect or support any place of worship against his consent," I do not agree. In my judgment, such an interpretation is not justified by any sound rule of construction as to the meaning of the provisions quoted. *Moore v. Monroe*, 64 Ia., 367, 20 N. W. Rep., 475; *Pfeiffer v. Board of Education*, 118 Mich., 560, 42 L. R. A., 536, 77 N. W. Rep., 250. If the views therein expressed are sound, then it would seem that it is in the power of any taxpayer to prevent religious exercises in any of the penal, reformatory or eleemosynary institutions in the state, and to close the doors of the state capitol to the chaplains of both branches of the legislature. Provisions in substance, if not in the exact language of our constitution, relating to freedom of religious worship and exemption from involuntary support of any place of worship, are found in very many of the constitutions of the different states of the Union. With the exception of the case from Wisconsin cited in the opinion, I know of no authority holding to the view that exercises in the public schools or other secular institutions of the nature and character

shown to have been engaged in in the case at bar would constitute the place where held a place of worship within the meaning of the fundamental law. Says Judge Cooley, who as an author in this branch of jurisprudence ranks highest: "The American constitutions contain no provisions which prohibit the authorities from such solemn recognition of a superintending Providence in public transactions and exercises as the general religious sentiment of mankind inspires, and as seems meet and proper in finite and dependent beings. Whatever may be the shades of religious belief, all must acknowledge the fitness of recognizing in important human affairs the superintending care and control of the great Governor of the universe, and of acknowledging with thanksgiving His boundless favors, or bowing in contrition when visited with the penalties of His broken laws. No principle of constitutional law is violated when thanksgiving or fast days are appointed; when chaplains are designated for the army and navy; when legislative sessions are opened with prayer or the reading of the Scriptures, or when religious teaching is encouraged by the general exemption of the houses of religious worship from taxation for the support of state government." Cooley, Constitutional Limitations [5th ed.], p. 582. Nor do I wish to be understood as holding to the view that it is not within the discretionary power of the authorities of school districts to sanction, if deemed wise, under proper restrictions, the reading of the Bible or portions thereof, or readings therefrom, in the public schools. The Bible itself is not a sectarian book, and it is an erroneous conception to so regard it. Altogether, aside from its theological aspects, the Bible has a historical and literary value surpassed by no secular writings. Its moral teachings and precepts are of the purest and highest, and appeal to the noblest impulses of mankind, as no other literary production ever has. Can anyone successfully contend in the light of the contemporaneous history of the times that the constitutional framers and the people who adopted that instrument intended to altogether exclude the Bible

from the schools? If such had been the intention, would not the members of the convention have expressed themselves in such language as could not be misunderstood? A constitutional provision concerning religious freedom should, it is said, be construed in relation to the state of the law and custom as they existed at the time of its adoption, and the courts can take judicial notice of customs and usages in regard to the use of the Bible in the public schools. *Pfeiffer v. Board of Education, supra.* The provision of the constitution on the subject of sectarian instruction in the public schools should be construed so as to give it the scope and effect intended by its framers and the people who adopted it. This is accomplished by firmly excluding therefrom all forms of instruction calculated to establish and confirm in the minds of the students those theological doctrines and beliefs which are peculiar to some only of the different religious sects. Further than this we are not warranted in going.

The following opinion, overruling a motion for rehearing, was filed on January 21, 1903:

1. **Natural Right of Conscience:** STATE CONSTITUTION. The right of all persons to worship Almighty God according to the dictates of their own consciences is declared by the constitution of this state to be a natural and indefeasible right.

2. **Duty of Government to Teach Religion:** CONSTITUTION: HISTORY. There is nothing in the constitution or laws of this state, nor in the history of our people, upon which to ground a claim that it is the duty of government to teach religion.

3. **The Whole Duty of the State.** The whole duty of the state with respect to religion is "to protect every religious denomination in the peaceable enjoyment of its own mode of public worship."

4. **Compulsory Religious Attendance.** Enforced attendance upon religious services is forbidden by the constitution, and pupils in a public school can not be required either to attend such services or to join in them.

5. **Teacher:** AUTHORITY: REQUEST: COMMAND. A teacher in a public school, being vested during school hours with a general authority over his pupils, his requests are practically commands.

6. **Objection of Parent.** It is immaterial whether the objection of a parent to his children attending, and participating in, a religious service conducted by a teacher in the schoolroom during school hours, is reasonable or unreasonable. The right to be unreasonable in such matters is guaranteed by the constitution.

7. **Use of Bible.** The law does not forbid the use of the Bible in the public schools; it is not proscribed either by the constitution or the statutes; and the courts have no right to declare its use to be unlawful because it is possible or probable that those who are privileged to use it will misuse the privilege by attempting to propagate their own peculiar theological or ecclesiastical views and opinions.

8. **Point Where Courts May Interfere.** The point where the courts may rightfully interfere to prevent the use of the Bible in a public school, is where legitimate use has degenerated into abuse,—where a teacher employed to give secular instruction has violated the constitution by becoming a sectarian propagandist.

9. **Bible-Reading:** SECTARIAN INSTRUCTION. Whether it is prudent or politic to permit Bible reading in the public schools is a question for the school authorities, but whether the practice of Bible reading has taken the form of sectarian instruction is a question for the courts to determine upon evidence.

10. ———: ———: PRESUMPTION. It will not be presumed in any case that the law has been violated; every alleged violation must be established by competent proof.

SULLIVAN, C. J.

This case was decided at the last term and is now before us on motion for a rehearing. In the brief filed in support of the motion the distinguished counsel for respondents has with considerable ardor attacked, not only the decision, but what he supposes to be its implications. The questions discussed are important and they have received our most serious consideration. We have again with great care gone over the arguments of counsel and have again critically examined all of the adjudged cases bearing directly or indirectly upon the points in controversy. The decision of the supreme court of Michigan—a decision rendered by a divided bench—may, perhaps, be regarded as an authority in favor of one of the positions for which respondents contend, but opposed to that case are the

unanimous judgments of the highest courts of Ohio and Wisconsin. Other cases cited in the briefs are based upon constitutional provisions essentially different from ours and are therefore entitled to but little weight as precedents. The fact that there has been Bible reading and religious exercises in many of the public schools ever since the present constitution was adopted is cited as evidence of a contemporaneous and practical construction in favor of the practice; but in our opinion, it is rather to be regarded as evidence of the temperate and tolerant spirit of our people, of the waning influence of doctrinal differences and of a clearer and more general perception of the cardinal truth that, after all, Christianity is greater than creed. It has been the policy of some rulers, as, for instance, Catherine de Medici, to strengthen the throne by dividing the people; but in this country it has been the constant policy of government to unite the people, to bring them closer and closer together, to dissipate race and religious prejudices and to fuse their sentiments and aspirations. One of the means to accomplish this end was to give all religious sects and systems a free field and no favors. So far as religion is concerned the laissez-faire theory of government has been given the widest possible scope. The suggestion that it is the duty of government to teach religion has no basis whatever in the constitution or laws of this state, nor in the history of our people. The teaching of religion would mean teaching the system of faith and worship of one or more of the religious sects; it would mean sectarianism in the public schools, and to put sectarianism into the schools would, according to the opinion prevailing when the constitution was ratified, be to put venom into the body politic. In section 4 of the bill of rights we find this language: "Religion, morality, and knowledge, however, being essential to good government, it shall be the duty of the legislature to pass suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, and to encourage schools and the means of instruction." There is

no uncertainty as to the meaning of this clause; there is no room for construction; and where, as Judge Cooley has said, the meaning of an instrument is plainly declared by the instrument itself, courts are not at liberty to search elsewhere. The duty of the state with respect to religion —its whole duty—is "to protect every religious denomination in the peaceable enjoyment of its own mode of public worship." This duty is not due alone to the different denominations of the Christian religion, but is due to every religious body, organization or society whose members are accustomed to come together for the purpose of worshiping the Supreme Being. The framers of the constitution, after expressing their gratitude to Almighty God for freedom, declared that the right of all persons to worship according to the dictates of their own consciences is a natural and indefeasible right. This right of the relator has been infringed. Without his consent and over his protest his children have been compelled to attend divine worship and to participate in it. They have been obliged to give homage to God, not according to the dictates of their own consciences or the consciences of their parents, but according to the dictates of the conscience of the teacher. Undoubtedly the teacher is a sincere and well-meaning young woman, and was actuated by the purest and best motives, but in discharging what she conceived to be an imperative duty to her Creator, she violated a right secured to the relator by the supreme law of the state. The regular morning exercises of the school consisted of a formal or improvised prayer, followed by the singing of Gospel Hymns, such as "Jesus, Lover of my Soul" and "When He Cometh." In these exercises the pupils were compelled to join, and it was their custom, when prayer was offered, to rise from their seats and stand in an attitude of reverence. It is said that the relator's children were subjected to no compulsion, but that is not true. It was not only their right to attend the school, but under the statute (Compiled Statutes, 1901, ch. 79, subdiv. 16, sec. 1), it was their duty to attend that school or some

other. As the morning exercises were conducted during school hours, it is difficult to see how they could attend the school without attending worship. But in our view they were not only compelled to attend worship, but to participate in it. The school being in session, the right to command was vested in the teacher, and the duty of obedience imposed upon the pupils. Under such circumstances a request and a command have the same meaning. A request from one in authority is understood to be a mere euphemism; it is in fact a command in an inoffensive form. The teacher, in describing her manner of conducting the exercises, says that after reading from the Bible she "called upon" the pupils to rise, and that she "had them rise from their seats and stand" while she offered prayer. When we take into account the fact that she was dealing with children, it can hardly be doubted that any pupil who joined unwillingly in the exercises joined under compulsion. Whether Mr. Freeman was reasonable or unreasonable in objecting to his children actively or passively participating in the simple religious service conducted by the teacher, is altogether immaterial. Some men always have been unreasonable in such matters, and their right to continue to be unreasonable is guaranteed by the constitution and characterized as a natural and indefeasible right. The privilege of choosing when, where and how he shall worship is given unconditionally to every one. He may freely choose his own prayers, songs and postures; and none of these may be lawfully imposed upon him, either in the public schools or elsewhere, except possibly in the penal, reformatory or other institutions where the state stands *in loco parentis* to the inmates. In order to make it entirely clear that the Bible was not read in the school as mere literature, and that the hymns were not sung as a vocal exercise and that the prayers were not offered for the sake of their reflex influence, but that the several acts were acts of religious homage and were intended to be devotional, we quote from the testimony of the teacher:

Q. Now, you say this matter of reading the Bible and singing of hymns was talked over by Mr. Odell at the time he employed you?

A. Yes, sir.

Q. Did you talk about any other branches that you were going to teach at that time?

A. I spoke about having new books; needing a new set of books.

Q. Why was it that you and he thought it proper and necessary that these exercises should be conducted?

A. One reason I spoke about it was because I had said at the beginning that I did not care to take the contract unless I had the privilege of having the exercises. I said I was in favor of doing all I could for the district, and was in favor of doing all I could to have a good school.

Q. Why did you think these exercises so important?

A. There was nothing only that I had always had them and I knew they had done away with them.

Q. And you couldn't open school without them?

A. Not according to my belief; no, sir.

Q. According to your belief, then, these are very necessary as a part of the school exercises?

A. I think it is important to having reading of the Bible and singing of songs in the school.

Q. And then you think that the way you have of reading the Bible is very important?

A. I think it is the Book of all books.

Q. For what purpose do you read it?

A. For the benefit of myself and those with whom I come in contact.

Q. In what particular way do you expect to benefit yourself and the children?

A. I think there is a higher Being that has something to do with our actions, and I know in many instances I have been directed to do things right, wherein if I hadn't trusted in Him, my Saviour, I would have been led away.

Q. And you read that book as religious exercises be-

63

cause you think it is important for that purpose, don't you?

A. I think it is.

Q. Yes, and you read it because you think it is the word of God?

A. Yes, sir, I do.

Q. And you believe that sincerely?

A. Yes, sir, I do.

Q. And you select such parts to read as you think proper, don't you?

A. Yes, sir, just as I think it would be best for the pupils and myself.

Q. And whenever you see fit to read, you read?

A. Yes, sir.

Q. And you read whatever you see fit to read?

A. Yes, sir.

Q. And did you read from the New Testament and the Old Testament both?

A. Yes, sir.

Q. And why do you consider it is necessary to offer a prayer?

A. I think we are taught to pray.

Q. Yes, you think it is done as an act of worship, the whole thing?

A. We think it is; yes, sir.

Q. Intended to worship God?

A. Yes, sir."

It is said by Commissioner AMES that the morning exercises conducted by Miss Beecher constituted sectarian instruction. This conclusion is vigorously assailed, but, in our judgment, it is warranted by the evidence and we adhere to it. The decision does not, however, go to the extent of entirely excluding the Bible from the public schools. It goes only to the extent of denying the right to use it for the purpose of imparting sectarian instruction. The pith of the opinion is in the syllabus, which declares that "Exercises by a teacher in a public school in a school building, in school hours, and in the presence

of the pupils, consisting of the reading of passages from the Bible, and in the singing of songs and hymns, and offering prayer to the Deity in accordance with the doctrines, beliefs, customs or usages of sectarian churches or religious organizations, is forbidden by the constitution of this state." Certainly the Iliad may be read in the schools without inculcating a belief in the Olympic divinities, and the Koran may be read without teaching the Moslem faith. Why may not the Bible also be read without indoctrinating children in the creed or dogma of any sect? Its contents are largely historical and moral; its language is unequalled in purity and elegance; its style has never been surpassed; among the classics of our literature it stands pre-eminent. It has been suggested that the English Bible is, in a special and limited sense, a sectarian book. To be sure there are, according to the Catholic claim, vital points of difference with respect to faith and morals betwen it and the Douai version. In a Pennsylvania case cited by counsel for respondents, the author of the opinion says that he noted over fifty points of difference between the two versions,—some of them important and others trivial. These differences constitute the basis of some of the peculiarities of faith and practice that distinguish Catholicism from Protestantism and make the adherents of each a distinct Christian sect. But the fact that the King-James translation may be used to inculcate sectarian doctrines affords no presumption that it will be so used. The law does not forbid the use of the Bible in either version in the public schools; it is not proscribed either by the constitution or the statutes, and the courts have no right to declare its use to be unlawful because it is possible or probable that those who are privileged to use it will misuse the privilege by attempting to propagate their own peculiar theological or ecclesiastical views and opinions. The point where the courts may rightfully intervene, and where they should intervene without hesitation, is where legitimate use has degenerated into abuse,—where a teacher employed to give

secular instruction has violated the constitution by becoming a sectarian propagandist. That sectarian instruction may be given by the frequent reading, without note or comment, of judiciously selected passages, is, of course, obvious. A great modern philosopher—perhaps the greatest— has said that persistent iteration is the most effective means of forcing alien conceptions upon reluctant minds. Whether it is prudent or politic to permit Bible reading in the public schools, is a question for the school authorities to determine; but whether the practice of Bible reading has taken the form of sectarian instruction in a particular case is a question for the courts to determine upon evidence. It can not be presumed that the law has been violated; the alleged violation must in every instance be established by competent proof. The value of the common schools as disseminators of knowledge and social levelers is well understood and justly appreciated, and there is little likelihood that the people will ever permit their usefulness to be impaired by sectarian controversies. When we consider that this is the first case of its kind ever presented to this court for decision, we feel assured that neither teachers nor school boards have been much inclined to bring discord into the schools for the chance of securing by indirection a slight sectarian advantage. But if the fact were otherwise, it could not in any way affect our conclusion. The section of the constitution which provides that "no sectarian instruction shall be allowed in any school or institution supported in whole or in part by the public funds set apart for educational purposes,"* can not, under any canon of construction with which we are acquainted, be held to mean that neither the Bible, nor any part of it, from Genesis to the Revelation, may be read in the educational institutions fostered by the state. We do not wish to be understood as either countenancing or discountenancing the reading of the Bible in the public schools. Even where it is an irritant element, the question whether its legitimate use shall be continued or

---

* Sec. 11, art. 8.

discontinued is an administrative and not a judicial question; it belongs to the school authorities, not to the courts.

The motion for a rehearing is overruled and the judgment heretofore rendered is adhered to.

FORMER JUDGMENT ADHERED TO.